**Richard P. CHRISTY; Thomas B. Guthrie; Ira Perkins, Plaintiffs–Appellants,**

v.

**Donald P. HODEL, Secretary of the Interior; United States Department of Interior, Defendants–Appellees.**

No. 87–3998.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 5, 1988.

Decided Sept. 21, 1988.

K. Dale Schwanke, and Sue Ann Love, Great Falls, Mont., for plaintiffs-appellants.

Jacques B. Gelin, Dept. of Justice, Washington, D.C., for defendants-appellees.

Before ALARCON and BEEZER, Circuit Judges, and HENDERSON,[*] District Judge.

ALARCON, Circuit Judge:

Plaintiffs–Appellants Richard P. Christy (Christy), Thomas B. Guthrie (Guthrie), and Ira Perkins (Perkins) appeal from the district court's grant of summary judgment in favor of Defendants–Appellees Donald P. Hodel, Secretary of the Interior (Secretary) and the United States Department of Interior (Department). The district court rejected plaintiffs' claim that the Endangered Species Act (ESA) and certain regulations promulgated thereunder are unconstitu-

tional as applied because they prevent plaintiffs from defending their sheep by killing grizzly bears. The court also rejected plaintiffs' claims that the ESA unlawfully delegated legislative authority to the Secretary and that the Secretary exceeded his lawful authority in promulgating the regulations at issue. We affirm.

I. FACTS

Christy owned 1700 head of sheep. On or about June 1, 1982, he began grazing the sheep on land he had leased from the Blackfeet Indian Tribe. The land was located adjacent to Glacier National Park in Glacier County, Montana.

Beginning about July 1, 1982, bears attacked the herd on a nightly basis. The herder employed by Christy frightened the bears away with limited success by building fires and shooting a gun into the air. Christy sought assistance from Kenneth Wheeler, a trapper employed by the United States Fish and Wildlife Service. Wheeler set snares in an attempt to capture the bears.

By July 9, 1982, the bears had killed approximately twenty sheep, worth at least $1200. That evening, while Christy and Wheeler were on the leased land together, Christy observed two grizzly bears emerge from the forest. One of the bears quickly retreated to the trees. The other bear moved toward the herd. When the animal was 60–100 yards away, Christy picked up his rifle and fired one shot, which hit the bear. It ran a short distance, then fell to the ground. Christy approached the bear and fired a second shot into its carcass to ensure that it was dead.

Wheeler's subsequent efforts to capture any bears were unsuccessful. On July 22, 1982, the Tribe agreed to terminate the lease and to refund Christy's money. On July 24, 1982, Christy removed his sheep from the leased land, having lost a total of 84 sheep to the bears during the lease term.

Pursuant to authority conferred by the ESA, the Secretary has listed the grizzly

[*] Honorable Thelton E. Henderson, United States District Judge for the Northern District of California, sitting by designation.

bear (Ursus arctos horribilis) as a threatened species throughout the 48 contiguous states. 50 C.F.R. § 17.11(h) (1987). Regulations promulgated by the Department forbid the "taking" of grizzly bears, except in certain specified circumstances. *See id.* § 17.40(b).[1]

The Department assessed a civil penalty of $3,000 against Christy for killing a grizzly bear in violation of the ESA and the regulations. On August 13, 1984, at Christy's request, the Department held an administrative hearing. At the hearing, Christy admitted that he had killed the bear knowing it to be a grizzly, but contended that he did so in the exercise of his right to defend his sheep. The administrative law judge (ALJ) upheld the imposition of a penalty but lowered the amount to $2,500.

Christy filed an administrative appeal, arguing that the imposition of a penalty violated his alleged constitutional right to defend his sheep. The appeal was denied on the ground that the Department had no jurisdiction to determine the constitutionality of federal laws or regulations.

On January 30, 1986, Christy instituted the present action. Also named as plaintiffs are Guthrie and Perkins, who have pastured flocks of sheep in Teton County, Montana. Guthrie and Perkins allege that they, too, have lost sheep to grizzly bears. They allege that they were informed by the United States Fish and Wildlife Service that they would be fined if they harmed or killed a grizzly bear, even in defense of their sheep. Guthrie alleges that, "[a]s a result of his losses to the grizzly bears and the harassment of the flock by the bears in the years 1984 and 1985, Guthrie sold all the merchantable sheep from his flock in 1985."

Plaintiffs seek a permanent injunction restraining defendants from enforcing the ESA and the grizzly bear regulations against them. Christy seeks a declaration that the Department's application of the ESA and the regulations to him in the administrative proceeding deprived him of "his fundamental right to possess and protect his property," deprived him of his property and liberty without just compensation or due process, and deprived him of equal protection of the laws. Guthrie and Perkins seek a declaration that the promulgation of the regulations was unconstitutional on the same grounds asserted by Christy. All plaintiffs seek a declaration that application of the ESA and the regulations to them in circumstances where they are defending their property is unconstitutional. Plaintiffs also seek declarations that the ESA contained an unconstitutional delegation of legislative power to the Secretary and that the Secretary exceeded his delegated authority in promulgating the regulations.

The Department filed a counterclaim against Christy seeking judgment in the amount of $2,500, plus interest, representing the unpaid penalty assessed against him by the ALJ. The Department lodged the administrative record with the district court.

On July 23, 1986, the defendants filed a motion for summary judgment. The defendants relied on the facts alleged in the complaint and on the administrative record. In response, plaintiffs asserted that "genuine issues of material fact exist as to allegations of Plaintiffs' Complaint." Plaintiffs, however, submitted no affidavits or other evidence in opposition to the defendants' motion.

On May 4, 1987, the district court issued a Memorandum and Order granting the defendants' motion for summary judgment. The court found that "[t]he material facts preceding and arising from this lawsuit are not in dispute." The court ruled that the

---

**1.** The pertinent regulations are referred to throughout this opinion as "the grizzly bear regulations" or simply "the regulations."

"Taking," as defined in the ESA, means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (1982). This case concerns only the *killing* of grizzly bears in defense of sheep. For the sake of precision, and to avoid confusion between plaintiffs' "taking" of grizzly bears and the government's alleged "taking" of plaintiffs' sheep without just compensation, our opinion shall refer to the "killing," rather than the "taking," of grizzly bears, except when quoting sources that use the latter term.

defendants were entitled to judgment as a matter of law. The court rejected plaintiffs' argument that there is a fundamental right to possess and protect property. Accordingly, the court evaluated the ESA and the grizzly bear regulations under the "rational basis" test and found that they satisfied that test. The court next rejected plaintiffs' contention that the loss of their sheep constituted a taking of their property by the federal government without just compensation. The court held that damage to private property by protected wildlife does not constitute a taking.

The court further concluded that "the ESA is a valid delegation of legislative authority," and that "the regulations at issue are a rational reflection of Congressional will, properly promulgated under the authority vested in the Secretary of the Interior." Finally, the court affirmed the penalty assessed against Christy by the ALJ, finding that it was supported by substantial evidence contained in the administrative record. Plaintiffs now appeal from the judgment entered against them.

## II. JURISDICTION

This action arises under the United States Constitution and under the ESA, 16 U.S.C. §§ 1533(d), 1540(g) (1982). The district court had jurisdiction over the action pursuant to section 1540(g) and 28 U.S.C. §§ 1331, 1346(a)(2) (1982). We have jurisdiction over plaintiffs' appeal from the final judgment pursuant to 28 U.S.C. § 1291 (1982). The judgment was entered on May 4, 1987, and plaintiffs filed their notice of appeal on June 30, 1987. Thus, the notice was timely filed. Fed.R.App.P. 4(a)(1).

## III. DISCUSSION

A grant of summary judgment is reviewed de novo. *Coverdell v. Department*

*of Social & Health Services*, 834 F.2d 758, 761 (9th Cir.1987). We must determine, "viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Id.* at 761–62.

Plaintiffs contend that entry of summary judgment was improper because "many genuine issues of material fact are unresolved." In their motion for summary judgment, the defendants relied on facts set forth in plaintiffs' own complaint, together with the administrative record. Plaintiffs submitted no evidence, by affidavit or otherwise, in opposition to the defendants' motion.

When a defendant's motion shows that there are no genuine issues of material fact, a plaintiff's unsupported assertion to the contrary is insufficient to forestall summary judgment. "Once the moving party shows the absence of evidence [to support the nonmoving party's case], the burden shifts to the nonmoving party to designate ' "specific facts showing that there is a genuine issue for trial." ' " *Id.* at 769 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), quoting Fed.R.Civ.P. 56(e)). Because plaintiffs failed to demonstrate the existence of any genuine issues of material fact,[2] we need only determine whether the district court correctly applied the relevant law to the facts of record.

### A. Do the ESA and the Regulations, as Applied, Deprive Plaintiffs of Property Without Due Process?

Plaintiffs contend that application of the ESA and the regulations so as to prevent

---

2. Plaintiffs assert that whether the ESA and the grizzly bear regulations rationally further Congress's goal of conserving threatened species is a genuine issue of material fact. In assessing whether challenged legislation rationally furthers a legitimate governmental goal, the court will consider not only the basis on which the legislature actually acted, if ascertainable, but also *any hypothetical basis* on which it might have acted. "As long as there is any conceivable basis for finding such a rational relationship, the law will be upheld." 2 R. Rotunda, J. Nowak & J. Young, *Treatise on Constitutional Law: Substance and Procedure* § 15.4, at 59 (1986) [hereinafter Rotunda]; *id.* at 60 ("The law will be upheld so long as the justices can conceive of a basis for terming the classification rationally related to a legitimate end of government."). Since the court itself may postulate a basis for the legislation, satisfaction of the rationality test should be deemed a legal, rather than a factual, issue.

them from defending their sheep against destruction by grizzly bears deprives them of property without due process, in violation of the fifth amendment.[3] The first step in our analysis is to determine the standard to be applied in reviewing the challenged legislation.

Strict judicial scrutiny of legislation that allegedly violates the due process clause is reserved for those enactments that "impinge upon constitutionally protected rights." *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973). When legislation impairs the exercise of a "fundamental" right, the government "must prove to the Court that the law is necessary to promote a compelling or overriding interest." 2 Rotunda § 15.4, at 59; *accord Beller v. Middendorf*, 632 F.2d 788, 808 (9th Cir.1980), *cert. denied*, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405, 454 U.S. 855, 102 S.Ct. 304, 70 L.Ed.2d 150 (1981).

On the other hand, when the legislative enactment infringes on no fundamental right, "the law need only rationally relate to any legitimate end of government." 2 Rotunda § 15.4, at 59; *accord Beller*, 632 F.2d at 808. The law will be upheld if the court can hypothesize any possible basis on which the legislature might have acted. *See supra* note 2.

The right claimed by the plaintiffs in this action is the right "to protect their property from immediate destruction from federally protected wildlife." In their opening brief, plaintiffs characterize this as a "natural and fundamental constitutional right." In their reply brief, plaintiffs backtrack somewhat, arguing that the right "should be deemed fundamental."

Certain state courts have construed their own constitutions to protect the sort of right claimed by the plaintiffs in this case.

*See, e.g., Cross v. State*, 370 P.2d 371, 376, 377 (Wyo.1962) (due process clause in state constitution construed to guarantee "the inherent and inalienable right to protect property"); *State v. Rathbone*, 110 Mont. 225, ——, 100 P.2d 86, 90 (1940) (state constitution expressly guaranteed the right "of acquiring, possessing, and protecting property"); *see generally* Annotation, *Right to Kill Game in Defense of Person or Property*, 93 A.L.R.2d 1366 (1964). No court, however, has construed the United States Constitution to protect such a right. *See Mountain States Legal Found v. Hodel*, 799 F.2d 1423, 1428 n. 8 (10th Cir.1986) (en banc) (noting the absence of authority on the question), *cert. denied*, —— U.S. ——, 107 S.Ct. 1616, 94 L.Ed.2d 800 (1987).

The ESA expressly provides that no civil penalty shall be imposed on a defendant who proves that, in killing a member of a threatened species, the defendant was acting in self-defense or in defense of others. 16 U.S.C. § 1540(a)(3) (1982); *see* 50 C.F.R. § 17.40(b)(1)(i)(B) (1987) ("Grizzly bears may be taken in self-defense, or in defense of others...."). The defendant may raise the same defense in criminal prosecutions under the ESA. 16 U.S.C. § 1540(b)(3) (1982). The ESA makes no mention, however, of a right to kill a member of a threatened species in defense of *property*.[4] One circuit court has opined that this omission evinces a congressional view that no such right exists under the United States Constitution. *See Mountain States*, 799 F.2d at 1428 n. 8.

The U.S. Constitution does not explicitly recognize a right to kill federally protected wildlife in defense of property. Plaintiffs, nevertheless, urge that we infer such a right, in much the same way that the Supreme Court has inferred a constitutional right to privacy despite the absence of language expressly recognizing such a right.

---

**3.** The fifth amendment provides, in pertinent part: "No person shall be ... deprived of life, liberty, or property, without due process of law...." U.S. Const. amend. V.

**4.** On the other hand, neither the ESA nor the regulations appear to forbid a property owner from attempting to fence out grizzly bears or to drive them away by nonharmful means. In-

deed, in the present case, Christy's herder enjoyed limited success in driving bears away by building fires and shooting a gun into the air. Thus, it is inaccurate to say that the laws prevent an owner from defending his property against grizzly bears. The laws merely operate to bar certain means of defending property from grizzly bears.

*See Griswold v. Connecticut,* 381 U.S. 479, 484–85, 85 S.Ct. 1678, 1681–82, 14 L.Ed.2d 510 (1965) (state law forbidding married couples from using contraceptives violated constitutional right to privacy).

The Supreme Court has recently expressed reluctance "to discover new fundamental rights imbedded in the Due Process Clause." *Bowers v. Hardwick,* 478 U.S. 186, 194, 106 S.Ct. 2841, 2846, 92 L.Ed.2d 140 (1986). The Court explained:

> There should be ... great resistance to expand the substantive reach of [the due process clauses of the fifth and fourteenth amendments], particularly if it requires redefining the category of rights deemed to be fundamental. Otherwise, the Judiciary necessarily takes to itself further authority to govern the country without express constitutional authority.

*Id.* at 195, 106 S.Ct. at 2846. The Court in *Bowers* refused to recognize a fundamental constitutional right of homosexuals to engage in sodomy, rejecting the argument that the constitutional right to privacy extended to protect such conduct. *Id.* at 190–94, 106 S.Ct. at 2843–46. The Court's reticence to "redefin[e] the category of rights deemed to be fundamental" is further manifested by the Court's refusal to find a fundamental right to such necessities as education, *Rodriguez,* 411 U.S. at 37, 93 S.Ct. at 1299, and adequate housing, *Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36 (1972).

The Supreme Court's teaching is clear and unmistakable—federal courts should refrain from divining new fundamental rights from the due process clauses of the fifth and fourteenth amendments, at least when the claimed right is neither "implicit in the concept of ordered liberty," *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), *overruled on other grounds, Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), or "deeply rooted in this Nation's history and tradition," *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977) (op. of Powell, J.). Thus, we recently "heed[ed] the Supreme Court's counsels of caution" and refused to extend the right to privacy to include the right of a prison inmate to be free from a state official's unauthorized disclosure of intimate photographs of the inmate's wife. *Davis v. Bucher,* 853 F.2d 718, 719, 721 (9th Cir.1988).

■ In light of the Supreme Court's admonition that we exercise restraint in creating new definitions of substantive due process, we decline plaintiffs' invitation to construe the fifth amendment as guaranteeing the right to kill federally protected wildlife in defense of property. In so doing, we do not minimize the seriousness of the problem faced by livestock owners such as plaintiffs nor do we suggest that defense of property is an unimportant value. We simply hold that the right to kill federally protected wildlife in defense of property is not "implicit in the concept of ordered liberty" nor so "deeply rooted in this Nation's history and tradition" that it can be recognized by us as a fundamental right guaranteed by the fifth amendment.

Because of our determination that the killing of grizzly bears to protect sheep is not a fundamental right enjoyed by the plaintiffs, we are not required to subject the ESA and the grizzly bear regulations to strict scrutiny. Instead, we must determine whether those enactments rationally further a legitimate governmental objective.

Plaintiffs do not argue that preservation of threatened species is an impermissible objective, or that Congress lacks authority to pursue that objective. Plaintiffs contend, rather, that the ESA and the grizzly bear regulations do not rationally further that objective. Plaintiffs' position appears to be that regulations preventing citizens from protecting their property against depredating bears will inevitably generate a backlash, including "unlawful killings resulting from the gross unfairness of the existing system."

■ We do not agree that the ESA and the regulations have no rational basis. Congress's intent in enacting the ESA was "to halt and reverse the trend towards species extinction, whatever the cost." *Tennessee Valley Authority v. Hill,* 437

U.S. 153, 184, 98 S.Ct. 2279, 2297, 57 L.Ed. 2d 117 (1978). The regulations at issue plainly advance this goal by forbidding the killing of grizzly bears, except in certain limited circumstances. *See* 50 C.F.R. § 17.40(b)(1)(i) (1981).

The regulations recognize the concerns and accommodate the needs of owners of livestock and other property by authorizing the killing of "nuisance bears" by government officials when efforts to live-capture such bears have been unsuccessful. *See id.* § 17.40(b)(1)(i)(C). The regulations are reasonable in requiring private citizens to seek the assistance of experienced government officials, who may be expected to protect the public interest, rather than leaving every individual free to kill a "nuisance bear" whenever he or she deems it necessary. *See State v. Webber,* 85 Or. App. 347, 350–51, 736 P.2d 220, 222 (state statute requiring owner to obtain permit before killing depredating wildlife was "a reasonable restraint on defendant's right to protect his property"), *review denied,* 304 Or. 56, 742 P.2d 1187 (1987).

Moreover, the regulations do not forbid plaintiffs from personally defending their property by means other than killing grizzly bears. *See supra* note 4; *see also Barrett v. State,* 220 N.Y. 423, 427–31, 116 N.E. 99, 101–02 (1917) (state statute forbidding molestation or disturbance of wild beavers held constitutional because it left property owners free to fence their land or to drive away destructive beavers).

For the foregoing reasons, the ESA and the grizzly bear regulations, as applied to prevent plaintiffs from killing such bears in defense of their property, do not deprive plaintiffs of their property without due process of law.

B. Do the ESA and the Regulations, as Applied, Deny Plaintiffs Equal Protection of the Laws?

Plaintiffs also argue that the ESA and the grizzly bear regulations, as applied to prevent them from killing grizzly bears to protect their sheep against imminent destruction, deny them equal protection of the laws.

The due process clause of the fifth amendment has been construed to require the federal government to accord every person within its jurisdiction equal protection of the laws. *See Jimenez v. Weinberger,* 417 U.S. 628, 637, 94 S.Ct. 2496, 2502, 41 L.Ed.2d 363 (1974) (referring to "the equal protection of the laws guaranteed by the due process provision of the Fifth Amendment"); *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) (invalidating racial segregation of public schools under the fifth amendment); *Eskra v. Morton,* 524 F.2d 9, 13 (7th Cir.1975) ("The United States, as well as each of the several States, must accord every person within its jurisdiction the equal protection of the laws.").

"[I]n order to subject a law to any form of review under the equal protection guarantee, one must be able to demonstrate that the law classifies persons in some manner." 2 Rotunda § 18.4, at 343–44. A classification may be demonstrated in one of three ways: by showing that the law, on its face, employs a classification; by showing that the law is applied in a discriminatory fashion; or by showing that the law is "in reality ... a device designed to impose different burdens on different classes of persons." *Id.* at 344.

Once a legislative classification has been demonstrated, it will be subjected to strict judicial scrutiny if it employs a "suspect" class or if it classifies in such a way as to impair the exercise of a fundamental right. 2 Rotunda § 15.4, at 60; *id.* § 18.3, at 323; *see Clark v. Jeter,* —— U.S. ——, 108 S.Ct. 1910, 1914, 100 L.Ed.2d 465 (1988) ("Classifications based on race or national origin, and classifications affecting fundamental rights, are given the most exacting scrutiny.") (citations omitted). On the other hand, "where the law classifies persons on a non-suspect basis for the exercise of liberties which are not fundamental constitutional rights," the law will be upheld if it rationally relates to a legitimate governmental objective. 2 Rotunda § 15.4, at 60; *see Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (in the area of economics and social

welfare, legislative classification satisfies requirements of equal protection if it has some "reasonable basis" and if any state of facts can be conceived to justify it).[5]

Plaintiffs argue that the ESA and the grizzly bear regulations classify persons along two lines. "The first classification," they contend, "is between a group of persons who, like Plaintiffs, are raising livestock near grizzly bear habitat and all remaining citizens and taxpayers of the U.S." Plaintiffs have made no showing, however, that the ESA or the grizzly bear regulations employ such a classification. This is certainly not a classification that appears on the face of the challenged enactments. Nor have the plaintiffs proffered any evidence to suggest that the prohibition on the killing of grizzly bears is applied with greater severity against persons raising livestock near grizzly bear habitat.[6] Finally, plaintiffs do not contend that the enactments constitute a device for imposing excessive burdens on such persons. In short, the first so-called classification identified by plaintiff—persons raising livestock near grizzly bear habitat—is simply not a classification made by the ESA or by the grizzly bear regulations.

The second classification identified by plaintiffs "is that which allows a certain group of people to hunt and kill grizzly bears under certain conditions for sport while withholding this same authority to livestock owners like Plaintiffs, even in immediate defense of their stock." This classification appeared on the face of the regulations as they read at all times relevant to this case:

> *Northwestern Montana.* If it is not contrary to the laws and regulations of the State of Montana, a person may hunt grizzly bears in the Flathead National Forest, the Bob Marshall Wilderness Area, and the Mission Mountains Primitive Area of Montana: *Provided,* That if in any year in question 25 grizzly bears have already been killed for whatever reason in that part of Montana, including the Flathead National Forest, the Bob Marshall Wilderness Area and the Mission Mountains Primitive Area, which is bounded on the north by the United States–Canadian Border, on the east by U.S. Highway 91, on the south by U.S. Highway 12, and on the west by Montana–Idaho State line, the Director shall post and publish a notice prohibiting such hunting, and any such hunting for the remainder of that year shall be unlawful....

50 C.F.R. § 17.40(b)(1)(i)(E) (1981).

■ Plaintiffs do not contend that the foregoing classification is "suspect," and no case so holds. Nor does this classification impair the exercise of any fundamental constitutional right. *See* Part III(A) *supra.* Accordingly, the classification should be upheld if it satisfies the "rational basis" test, *i.e.,* if any state of facts can be conceived to justify it.

■ Plaintiffs argue that no rational basis supports the provision for sport hunting of grizzly bears: "Not only is the hunting of a threatened species *unrelated* to the goals of the Act, it is *in complete derogation* of its purposes, i.e. the preservation of threatened species.... Indeed, given the threatened nature of their existence, allowing hunters to take even one [grizzly bear] arguably would be in direct conflict with the Act. Since this classification is in complete contradiction of the purposes of the Act, it can in no way have even a

---

5. The Court applies a middle-level scrutiny to legislation that classifies individuals according to sex or legitimacy of birth. *Jeter,* 108 S.Ct. at 1914; 2 Rotunda § 18.3, at 326–27. Classifications of this sort are not involved in the present case.

6. Of course, persons raising livestock near grizzly bear habitat are more likely to find themselves restrained by the regulations than, for example, persons residing in large metropolitan areas far removed from bear country. By the same token, persons who travel by automobile are more likely to find themselves restrained by speed limits than persons who travel by bicycle. Plaintiffs cite no authority for the proposition that a regulation that is evenhanded on its face and that is applied equally to all who violate its provisions nevertheless denies equal protection of the laws simply because it is *likely* to be applied more frequently against members of some identifiable, nonsuspect class of persons.

rational relationship to the purposes of the Act, as a matter of law."

Plaintiffs' argument is premised on the unsupported assumption that a program of carefully controlled killings of bears in limited geographic regions cannot promote "conservation" and, therefore, necessarily conflicts with the purpose of the ESA. On the contrary, Congress expressly contemplated that "in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved," conservation may require "regulated taking." 16 U.S.C. § 1532(3) (1982). Further, although it expressly prohibited the killing of *endangered* species, Congress delegated to the Secretary the task of determining whether the killing of *threatened* species should also be prohibited. *Compare id.* § 1538(a)(1)(B) (imposing general prohibition on killing of endangered species) *with id.* § 1533(d) (Secretary "shall issue such regulations as he deems necessary and advisable to provide for the conservation of" threatened species). Congress authorized, but did not require, the Secretary to forbid the killing of threatened species. *Id.* § 1533(d). This legislative scheme reflects Congress's conclusion that certain killings of a threatened species could be consistent with the goal of conserving that species.

The Secretary had a rational basis for authorizing "regulated taking" of grizzly bears, by means of sport hunting, in those regions specified in the regulations. The basis is set forth in Amendment Listing the Grizzly Bear of the 48 Coterminous States as a Threatened Species, 40 Fed.Reg. 31,-734–35 (1975) [hereinafter Amendment]. Briefly, relying on investigations by Fish and Wildlife Service biologists, data submitted by the Governors of Colorado, Idaho, Montana, Washington, and Wyoming, and comments filed by interested members of the public, the Director of the Fish and Wildlife Service, on behalf of the Secretary, determined that "grizzly bear population pressures definitely exist in the Bob Marshall Ecosystem." *Id.* at 31,735. The Director considered easing such pressures through live-trapping and transplantation of the animals but rejected that approach as "too dangerous and too expensive to be used with sufficient frequency to relieve the ... population pressures." *Id.* The Director concluded that "[a] limited amount of regulated taking is necessary." *Id.*

The Director then considered whether such regulated "taking" should be accomplished through the isolated killing of nuisance bears or through seasonal sport hunting. The Director concluded that isolated killings, while necessary, were "not sufficient to prevent numerous depredations and threats to human safety. This is because the occasional killing of one bear does not create a fear of man among the grizzly bear population in general." *Id.* A carefully controlled seasonal hunt, on the other hand, would both relieve the population pressures and condition the bears "to avoid all areas where humans are encountered," thus minimizing human-bear contact and the resultant risks to both. *Id.* Accordingly, the Director ruled that the best system of relieving the population pressures in the Bob Marshall Ecosystem would be "to combine limited taking of specific nuisance bears with a closely regulated sport hunt." *Id.* The promulgated regulations strictly controlled the total number of bears killed each year by mandating the cessation of hunting in any year "where the total number of bears killed for whatever reason ... reaches 25 bears for that year." *Id.*[7]

In light of the foregoing, the regulations authorizing a carefully controlled and limited sport hunt of grizzly bears in designated

---

7. On the basis of information collected subsequent to the promulgation of the initial regulations, the Secretary redesignated the geographic regions within which sport hunting would be permitted and lowered the number of bears that may be taken each year. *See* Revision of Special Regulations for the Grizzly Bear, 51 Fed. Reg. 33,753 (1986). The Secretary specifically considered and rejected the argument "that it was preposterous, illogical, and inconsistent to permit hunting of a threatened species." *Id.* at 33,757. The Secretary relied on studies and data suggesting that a carefully controlled sport hunt would eliminate unwary bears, thereby minimizing bear-human contact over the long-run and promoting conservation of the total bear population. *Id.* at 33,755, 33,757.

geographic regions had a rational basis. Plaintiffs have proffered no evidence to suggest otherwise. The classification employed by the regulations, therefore, does not deny plaintiffs equal protection of the laws.

### C. Do the ESA and the Regulations Effect a "Taking" of Plaintiffs' Property Without Just Compensation, in Violation of the Fifth Amendment?

■ The fifth amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. amend. V. This prohibition applies only to takings by the federal government. *See Twin Cities Chippewa Tribal Council v. Minnesota Chippewa Tribe,* 370 F.2d 529, 533 (8th Cir.1967) (citing *Koch v. Zuieback,* 316 F.2d 1, 2 (9th Cir. 1963)).[8] Plaintiffs contend that by protecting grizzly bears, the Department has transformed the bears into "governmental agents" who have physically taken plaintiffs' property.

The defendants analyze this case under the principles applicable to regulatory takings. Plaintiffs, on the other hand, insist that their property has been *physically* taken, because their sheep have been *"destroyed, killed,* and *rendered absolutely useless* by the bear's act."

The defendants properly focus on the regulations, promulgation of which constituted governmental action. The regulations themselves, however, do not purport to take, or even to regulate the use of, plaintiffs' property. The regulations leave the plaintiffs in full possession of the complete "bundle" of property rights to their sheep. Perhaps because plaintiffs recognize this fact, they choose to focus on the conduct of the bears. Undoubtedly, the bears have physically taken plaintiffs' property, but plaintiffs err in attributing such takings to the government.

Numerous cases have considered, and rejected, the argument that destruction of private property by protected wildlife constitutes a governmental taking. The pertinent cases were recently summarized by the Tenth Circuit:

Of the courts that have considered whether damage to private property by protected wildlife constitutes a "taking," a clear majority have held that it does not and that the government thus does not owe compensation. The Court of Claims rejected such a claim for damage done to crops by geese protected under the Migratory Bird Treaty Act in *Bishop v. United States,* 126 F.Supp. 449, 452–53, 130 Ct.Cl. 198 (1954), *cert. denied,* 349 U.S. 955, 75 S.Ct. 884, 99 L.Ed. 1279 (1955). The United States Court of Appeals for the Seventh Circuit rejected a similar claim under the Federal Tort Claims Act in *Sickman v. United States,* 184 F.2d 616 (7th Cir.1950), *cert. denied,* 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366 (1951). Several state courts have also rejected claims for damage to property by wildlife protected under state laws. *See, e.g., Jordan v. State,* 681 P.2d 346, 350 n. 3 (Alaska App.1984) (defendants were not deprived of their property interest in a moose carcass by regulation prohibiting the killing of a bear that attacked the carcass because "their loss was incidental to the state regulation which was enacted to protect game"); *Leger v. Louisiana Department of Wildlife & Fisheries,* 306 So.2d 391 (La. Ct.App.), *writ of review denied,* 310 So. 2d 640 (La.1975) (because wildlife is regulated by the state in its sovereign, as distinct from its propriety [*sic*] capacity, the state has no duty to control its movements or prevent it from damaging private property); *Barrett v. State,* 220 N.Y. 423, 116 N.E. 99 (N.Y.Ct.App.1917) (damage to timber by beavers not compensable because the state has a general right to protect wild animals as a matter of public interest, and incidental injury by them cannot be complained of); *see also Collopy v. Wildlife Commission,*

---

8. The fifth amendment's proscription against takings without just compensation is made applicable to state governments through the due process clause of the fourteenth amendment.

*Webb's Fabulous Pharmacies, Inc. v. Beckwith,* 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980).

*Department of Natural Resources*, 625 P.2d 994 (Colo.1981); *Maitland v. People*, 93 Colo. 59, 63, 23 P.2d 116, 117 (1933); *Cook v. State*, 192 Wash. 602, 74 P.2d 199, 203 (1937); *Platt v. Philbrick*, 8 Cal.App.2d 27, 30, 47 P.2d 302, 304 (1935). *But see State v. Herwig*, 17 Wis.2d 442, 117 N.W.2d 335 (1962); *Shellnut v. Arkansas State Game & Fish Commission*, 222 Ark. 25, 258 S.W. 2d 570 (1953).

*Mountain States*, 799 F.2d at 1428–29. The Tenth Circuit held that damage to private property caused by federally protected wild burros did not constitute a taking under the fifth amendment. *Id.* at 1431.

Plaintiffs do not challenge the constitutional power of Congress to enact legislation to protect threatened species. Yet plaintiffs would, in effect, require that the government insure its citizens against property damage inflicted by such species. The federal government does not "own" the wild animals it protects, nor does the government control the conduct of such animals.[9] *See Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977) ("[I]t is pure fantasy to talk of 'owning' wild fish, birds, or animals. Neither the States nor the Federal Government ... has title to these creatures until they are reduced to possession by skillful capture."). Plaintiffs assume that the conduct of the grizzly bears is attributable to the government but offer no explanation or authority to support their assumption.

Plaintiffs cite the following language from a recent Supreme Court opinion in support of their argument that the government should compensate them for the killing of their sheep by grizzly bears: "It is axiomatic that the Fifth Amendment's just compensation provision is 'designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *First English Evan-*

*gelical Lutheran Church v. County of Los Angeles*, — U.S. —, 107 S.Ct. 2378, 2388, 96 L.Ed.2d 250 (1987) (quoting *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). The foregoing principle is inapplicable to the present case, because neither the ESA nor the grizzly bear regulations "force" plaintiffs to bear any burden. The losses sustained by the plaintiffs are the incidental, and by no means inevitable, result of reasonable regulation in the public interest. As one state court has aptly noted:

> Wherever protection is accorded [to wild animals] harm may be done to the individual. Deer or moose may browse on his crops; mink or skunks kill his chickens; robins eat his cherries. In certain cases the Legislature may be mistaken in its belief that more good than harm is occasioned. But this is clearly a matter which is confided to its discretion. It exercises a governmental function for the benefit of the public at large, and no one can complain of the incidental injuries that may result.

*Barrett v. State*, 220 N.Y. at 427, 116 N.E. at 100.

For the foregoing reasons, we hold that the ESA and the grizzly bear regulations do not effect a taking of plaintiffs' property by the government so as to trigger the just compensation clause of the fifth amendment, and that the government is not answerable for the conduct of the bears in taking plaintiffs' property.

**D. Does the ESA Unconstitutionally Delegate Legislative Authority to the Secretary?**

■ The ESA provides that "[w]henever any species is listed as a threatened species ... the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d) (1982). Plaintiffs argue that the foregoing delega-

---

**9.** We note that plaintiffs do not contend, and the record does not show, that the federal government physically introduced any bears to the areas near plaintiffs' properties. Whether the government may be held responsible for dam-

age caused by bears or other wild animals that have been relocated by the government, under a theory that such animals are instrumentalities of the government, is a question we do not decide.

tion of legislative power is unconstitutional because it "fails to provide the necessary standards either to direct the Secretary in the promulgation of the regulations, or for a reviewing Court to employ in examining the content of the regulations against the statutory authorization."

Although the Constitution vests "all legislative powers" in Congress, U.S. Const. art. I, § 1, Congress may "establish general standards and delegate to others the responsibility for effectuating the legislative policy." *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 916 (5th Cir.1983) (citing *A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 529–30, 55 S.Ct. 837, 842–43, 79 L.Ed. 2d 1570 (1935)). A delegation of legislative authority will be upheld if the standards prescribed by Congress "are sufficiently definite and precise to enable Congress, the courts and the public to ascertain" whether regulations promulgated pursuant to that authority conform to the legislative will. *Yakus v. United States,* 321 U.S. 414, 426, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944); *see Marsh,* 715 F.2d at 916.

The standards set forth in the ESA are sufficiently definite and precise to withstand constitutional attack. The challenged standard requires the Secretary to promulgate "such regulations as he deems necessary and advisable to provide for the conservation of" species that the Secretary has listed as threatened. 16 U.S.C. § 1533(d) (1982). The term "conservation" is defined to mean the bringing of a threatened species "to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3). Congress provided the following examples of activities that constitute "conservation": "[A]ll activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, ... regulated taking." *Id.*

By limiting the Secretary's legislative authority to the promulgation of regulations that promote the "conservation" of threatened species, Congress has established a standard sufficiently definite and precise to permit the courts to determine whether the Secretary's enactments comport with congressional will. *See Sierra Club v. Clark,* 755 F.2d 608, 612–15 (8th Cir.1985) (invalidating regulation on ground that it exceeded scope of Secretary's authority to provide for the "conservation" of threatened species). It is our conclusion that the ESA does not unconstitutionally delegate legislative authority to the Secretary.

E. Did the Secretary Exceed the Scope of His Delegated Authority in Promulgating Regulations Permitting Limited Sport Hunting of Grizzly Bears?

The grizzly bear regulations permit limited sport hunting of grizzly bears in specified geographic regions of Montana. *See* 50 C.F.R. § 17.40(b)(1)(i)(E) (1981) (quoted and discussed in Part III(B) *supra* ). Plaintiffs argue that such regulations are contrary to the purpose of the ESA: "The hunting and killing of up to 25 grizzly bears each year cannot be deemed, under any imaginable set of circumstances, as providing for the *conservation* of grizzly bears."

Congress has expressly authorized the "regulated taking" of threatened species "in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved." 16 U.S.C. §§ 1532(3), 1533(d) (1982). Thus, the Secretary is authorized to permit "regulated taking," *e.g.* limited sport hunting, but he must first find that "population pressures within a given ecosystem cannot be otherwise relieved." *Sierra Club,* 755 F.2d at 613.

█ The Secretary has acted within the scope of his authority in this case. His subordinate, the Director of the Fish and Wildlife Service, expressly determined that the population of grizzly bears in the Bob Marshall Ecosystem created pressures that could not be relieved other than through

carefully regulated sport hunting. *See* Amendment, 40 Fed. Reg. at 31,735. The regulations as promulgated reflected this determination, by limiting the hunting of grizzly bears to designated areas within the Bob Marshall Ecosystem. *See* 50 C.F. R. § 17.409b)(1)(i)(E) (1981).[10] The Director's determination was supported by a detailed statement of reasons. *See* Amendment, 40 Fed.Reg. at 31,735. Plaintiffs have proffered no evidence to raise a genuine issue of fact concerning the validity of the Secretary's stated reasons.

In summary, the Secretary did not exceed his delegated authority in promulgating regulations providing for limited and controlled sport hunting of grizzly bears in designated geographic regions of Montana.

## IV. CONCLUSION

For the reasons set forth herein, we AFFIRM the district court's entry of summary judgment in favor of defendants.

**10.** In 1986, the regulations were amended to redesignate the geographic areas within which hunting of grizzly bears is permitted. *See supra* note 7. Plaintiffs do not challenge the amendment or the designation of certain hunting areas rather than others. Plaintiffs challenge the Secretary's authority to permit any hunting of grizzly bears.