UNITED STATES of America, Plaintiff–Appellee,

v.

Larry Wayne LaFLEUR, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Nick Michael HOLM, Defendant–Appellant.

Nos. 89–50599, 89–50644.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 9, 1991.

Decided Dec. 16, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 4, 1992.

---

John Lanahan, Asst. Federal Public Defender, San Diego, Cal., for defendant-appellant Larry Wayne LaFleur.

Richard Boesen, San Diego, Cal., for defendant-appellant Nick Michael Holm.

Larry A. Burns, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before: ALARCON, NORRIS and WIGGINS, Circuit Judges.

## ORDER

The opinion filed on December 16, 1991, (952 F.2d 1537 (9th Cir.1991)), is hereby amended. The last sentence of the first paragraph at 1547 is deleted and the following language substituted.

With this amendment, the panel has voted to deny the petition for rehearing. Judges Alarcon and Wiggins have voted to reject the suggestion for rehearing en banc. Judge Norris has voted to accept the suggestion for rehearing en banc.

The full court has been advised of the amendment to the opinion and the suggestion for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed.R.App.P. 35.

The petition for rehearing is denied and the suggestion for rehearing en banc is rejected.

## OPINION

WIGGINS, Circuit Judge:

Larry Wayne LaFleur appeals from a jury verdict finding him guilty of first degree murder under 18 U.S.C. § 1111(a), and from the life sentence he received pursuant to 18 U.S.C. § 1111(b). LaFleur contends that 1) the district court improperly refused to instruct the jury on voluntary manslaughter, 2) the district court erred in denying his motion for a new trial based on jury misconduct, and 3) the life sentence he received is unconstitutional. Nick Michael Holm appeals from the sentence imposed by the district court after he pleaded guilty to murder under § 1111(a) and was sentenced to life in prison pursuant to § 1111(b). Holm joins LaFleur's argument that the life sentence imposed pursuant to § 1111(b) is unconstitutional. This court has jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

## BACKGROUND

On January 10, 1989, Otto Bloomquist, an eighty-two-year-old man, drove with his wife to a shopping mall in Carlsbad, California, to have lunch. Bloomquist, who had approximately $300 in cash in his possession, waited in his car while his wife entered the mall to shop before lunch. The appellants, Larry LaFleur and Nick Holm, approached Bloomquist's car and, each displaying the gun he was carrying, forced Bloomquist to relinquish control of the vehicle. With LaFleur driving and Holm keeping Bloomquist at gun point, the car left the parking lot.

LaFleur drove the car to a remote area known as De Luz Canyon, which is part of the Camp Pendleton military base. After exiting the car, the three men walked down a deserted path and LaFleur and Holm killed Bloomquist by shooting him several times. It is undisputed that both men shot Bloomquist. LaFleur fired the first several shots, and then Holm shot Bloomquist in the back and head. However, there was conflicting testimony regarding the specific circumstances surrounding the shooting of Bloomquist. Each appellant claims both that the other initiated the killing, and that he committed the crime only under duress, alleging that the other forced him at gunpoint to shoot Bloomquist.

LaFleur and Holm were indicted on January 26, 1989 for a host of counts encompassing the murder, kidnapping, and robbery of Bloomquist. The district court granted a defense motion to have the trials of LaFleur and Holm severed. LaFleur's trial began on June 20, 1989. The next day, Holm entered a guilty plea to premeditated murder, and the remaining charges against him were dropped. LaFleur's trial ended on July 7, 1989 when the jury returned a guilty verdict on all counts. He was convicted of premeditated murder, felony murder, conspiracy to kidnap, kidnapping, robbery, use of a firearm during murder, use of a firearm during kidnapping, and use of a firearm during robbery. Both men were sentenced pursuant to 18 U.S.C. § 1111(b) to life in prison for the murder of Bloomquist. In addition, LaFleur received sentences for his other crimes.

On July 14, 1989, one of the LaFleur jurors, Kimberly Tucker, contacted district court Judge Enright and informed him that she and one other juror had learned of Holm's guilty plea during the trial. Based on this information, LaFleur filed a motion for a new trial. The district court held an evidentiary hearing and, after receiving testimony from the jurors, denied the motion.

## DISCUSSION

### *Appellant LaFleur*

#### A. *Voluntary Manslaughter Jury Instruction*

■ Appellant LaFleur contends that the district court erred by refusing to instruct the jury on voluntary manslaughter.[1] LaFleur argued at trial that he participated in the murder only as a result of

duress inflicted by Holm, who allegedly held LaFleur at gunpoint and forced him to shoot Bloomquist. LaFleur contends that such duress legally mitigates murder to voluntary manslaughter, and that he was therefore entitled to a voluntary manslaughter instruction.[2] The Ninth Circuit has not yet resolved the issue of whether a district court's decision not to instruct a jury on the defendant's theory of the case is reviewed de novo or for an abuse of discretion. *United States v. Whitehead*, 896 F.2d 432, 434 (9th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 342, 112 L.Ed.2d 306 (1990). *Compare United States v. Wagner*, 834 F.2d 1474, 1486 (9th Cir.1987) (de novo) *with United States v. Busby*, 780 F.2d 804, 806 (9th Cir.1986) (abuse of discretion). In this case the district court refused the instruction after concluding that duress was not "a legal excuse for the crime of premeditated murder." We are, therefore, confronted with a legal question: whether or not duress is a valid defense to murder under 18 U.S.C. § 1111(a) such that it mitigates murder to voluntary manslaughter. This is an issue of first impression, and our review is de novo. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) (legal questions reviewed de novo).

■ When a defendant commits a criminal act under the direct threat of another person, he commits the crime under duress. The duress defense, which provides the defendant a legal excuse for the commission of the criminal act, is based on the rationale that a person, when confronted with two evils, should not be punished for engaging in the lesser of the evils.[3]

1. With regards to the death of Bloomquist, the district court instructed the jury on first and second degree murder.

2. Voluntary manslaughter is the unlawful killing of a human being without malice "[u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a). Manslaughter involves a provocation which would "arouse a reasonable and ordinary person to kill someone." *United States v. Wagner*, 834 F.2d 1474, 1487 (9th Cir.1987) (quoting *United States v. Collins*, 690 F.2d 431,

437 (5th Cir.1982), *cert. denied*, 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 801 (1983)).

3. The duress defense consists of three elements: 1) an immediate threat of death or serious bodily injury; 2) a well-founded fear that the threat will be carried out; and 3) no reasonable opportunity to escape the threatened harm. *United States v. Contento–Pachon*, 723 F.2d 691, 693 (9th Cir.1984). A fourth element is sometimes required, namely, that the defendant submit to the authorities after the threat dissipates. *Id.* The duress defense is related to the necessity

LaFave and Scott aptly describe the defense as follows:

> One who, under the pressure of an unlawful threat from another human being to harm him ..., commits what would otherwise be a crime may, under some circumstances, be justified in doing what he did and thus not be guilty of the crime in question.... The rationale of the defense is not that the defendant, faced with the unnerving threat of harm unless he does an act which violates the literal language of the criminal law, somehow loses his mental capacity to commit the crime in question. Nor is it that the defendant has not engaged in a voluntary act. Rather it is that, even though he has done the act the crime requires and has the mental state which the crime requires, his conduct which violates the literal language of the criminal law is justified because he has thereby avoided a harm of greater magnitude.

LaFave & Scott, *Substantive Criminal Law* § 5.3 (1986) (footnotes omitted).

The "choice of evils" rationale for the duress defense is strained when a defendant is confronted with taking the life of an innocent third person in the face of a threat on his own life. The choice of evils rationale necessarily presumes that the threatened harm to the defendant is greater than the resulting harm from the defendant's commission of the crime. When the defendant commits murder under duress, the resulting harm—i.e. the death of an innocent person—is at least as great as the threatened harm—i.e. the death of the defendant. For this reason, the common law rejected duress as a defense to murder. *See* LaFave & Scott § 5.3 ("Duress cannot justify the intentional killing of ... an innocent third person."); 40 Am.Jur.2d, *Homicide* § 119 (1968); 40 C.J.S. *Homicide* § 113 (1944); 4 W. Blackstone, Commentaries *30; Witkin, Cal.Crim. 231(b); *United States v. Mitchell*, 725 F.2d 832, 835 n. 4

(2nd Cir.1983); *Arp v. State*, 97 Ala. 5, 12 So. 301 (1893).

Our review of state law indicates that the majority of states considering the issue have adopted the common law rule. *See, e.g.,* Ariz.Rev.Stat.Ann. § 13–412(C); Colo. Rev.Stat. § 18–1–708; Ga.Code Ann. § 16–3–26; Ind.Code § 35–41–3–8; Kan.Stat. Ann. § 21–3209; La.Rev.Stat.Ann. § 14:18(6); Me.Rev.Stat.Ann. tit. 17–A, § 103–A; Mo.Rev.Stat. § 562.071; Or.Rev. Stat. § 161.270; Wash.Rev.Code § 9A.16.-060;[4] *Tully v. State*, 730 P.2d 1206, 1208 (Okla.Crim.1986); *People v. Feldmann*, 181 Mich.App. 523, 449 N.W.2d 692, 697 (1989); *State v. Robinson*, 294 S.C. 120, 363 S.E.2d 104, 104 (1987); *People v. Dittis*, 157 Mich.App. 38, 403 N.W.2d 94, 95 (1987); *State v. Vines*, 317 N.C. 242, 253, 345 S.E.2d 169, 175 (1986); *State v. Finnell*, 101 N.M. 732, 737, 688 P.2d 769, 774, *cert. denied*, 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984).

In support of his argument that he was entitled to a manslaughter instruction, La-Fleur relies on *United States v. Alexander*, 695 F.2d 398 (9th Cir.1982), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2458, 77 L.Ed.2d 1337 (1983), in which the district court had read the following instruction: "Acts causing death but committed under duress and without malice aforethought may constitute voluntary manslaughter." *Id.* at 401. The issue in *Alexander* was the conflict between that instruction and one stating: "Coercion or duress may provide a legal excuse for the crime of robbery. It is not a legal excuse for the crime of murder." This court, on appeal, specifically refused to reach the question of whether the voluntary manslaughter instruction was properly given. Instead, the court decided the issue on harmless error grounds. *Id.* (court finding that a jury's guilty verdict on felony murder indicated that jury did not believe a duress/coercion defense,

---

defense. *Id.* at 695 (necessity defense traditionally involves natural physical forces beyond the actor's control whereas duress defense involves coercion from another human being); *United States v. Dorrell*, 758 F.2d 427, 430 n. 2 (9th Cir.1985) (same).

**4.** In a similar vein, some states disallow the duress defense for any crime punishable by death. *See, e.g.,* Cal.Pen.Code § 26; Idaho Code § 18–201(4); Ill.Rev.Stat. ch. 38, para. 7–11; Mont.Code Ann. § 94–3–110; Nev.Rev.Stat. § 194.010(8).

and that therefore any conflict between the instructions was harmless). Therefore, *Alexander* does not support LaFleur.

■■■ We are persuaded that duress is not a valid defense to § 1111(a) first degree murder. We believe that, consistent with the common law rule, a defendant should not be excused from taking the life of an innocent third person because of the threat of harm to himself. This, however, does not directly answer the question before us. LaFleur argues essentially that, even if duress is not a *complete* defense to § 1111(a) murder, it can act to *mitigate* murder to voluntary manslaughter.[5] We have found no compelling authority for LaFleur's proposition, and, after careful consideration, we reject it. We hold that duress cannot legally mitigate murder to manslaughter. The same rationale which dictates that duress is not a complete defense to murder demands that duress not be used by a defendant to mitigate the intentional killing of an innocent third person. Therefore, the district court did not err in denying LaFleur's request for a manslaughter instruction.

### B. *Juror Misconduct*

■■■ LaFleur contends that the district court erred in denying his motion for a new trial. He argues that he was prejudiced by the fact that two jurors learned of Holm's guilty plea during the course of his trial. A district court's denial of a motion for a new trial is reviewed for an abuse of discretion. *United States v. Endicott*, 869 F.2d 452, 457 (9th Cir.1989). Although we review alleged juror misconduct independently, we accord "substantial weight" to the district court's conclusion as to the effect of the misconduct. *United States v. Madrid*, 842 F.2d 1090, 1092 (9th Cir.), *cert. denied*, 488 U.S. 912, 109 S.Ct. 269, 102 L.Ed.2d 256, 257 (1988); *United States v. Bagnariol*, 665 F.2d 877, 885 (9th Cir.),

*cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982).

The record indicates that juror Gary Casarez learned, outside the proceedings, that appellant Holm had pleaded guilty to the murder of Bloomquist. He conveyed that fact to a second juror, Kimberly Tucker. Neither juror informed the court of their knowledge of Holm's plea during the trial. Instead, Tucker contacted Judge Enright after the trial. The district court held an evidentiary hearing and heard testimony from Casarez, Tucker, and the jury foreman. After hearing the evidence, the court denied LaFleur's motion for a new trial.

■■■ The information acquired by Casarez and Tucker is extraneous information,[6] and LaFleur is therefore entitled to a new trial if we find a "reasonable possibility" that the evidence could have affected the verdict. *United States v. Maree*, 934 F.2d 196, 201 (9th Cir.1991) (quoting *Madrid*, 842 F.2d at 1093–94). The district court found that there was no reasonable possibility that the juror's extraneous knowledge affected the verdict against LaFleur. We take guidance from two decisions of the Seventh Circuit. In *United States v. Weisman*, 736 F.2d 421 (7th Cir.), *cert. denied*, 469 U.S. 983, 105 S.Ct. 390, 83 L.Ed.2d 324 (1984), the court addressed a situation in which jurors learned of a codefendant's guilty plea. Although noting that "a codefendant's guilty plea ... might be prejudicial under some circumstances," the court found that there was no reasonable possibility that the juror knowledge of the plea affected the verdict. *Id.* at 424. The court reasoned that the appellant's theory of defense was "not inconsistent" with the codefendant's guilty plea. *Id.* Similarly, in *United States v. Bruscino*, 687 F.2d 938 (7th Cir.1982), *cert. denied*, 459 U.S. 1211, 103 S.Ct. 1205, 75 L.Ed.2d 446 and 459 U.S. 1228, 103 S.Ct. 1235, 75 L.Ed.2d

---

5. LaFleur points us to three states, Arizona, Minnesota, and Wisconsin, which have, in some form, adopted the proposition that duress can mitigate murder to something less than murder. *See* Ariz.Rev.Stat.Ann. § 13–1103; Minn.Stat. Ann. § 609.20; Wis.Stat.Ann. 940.05.

6. Jurors can be subject to either "extraneous information" or "ex parte contact". Extraneous information generally is that which pertains to any fact in controversy or any law applicable to the case. *See Madrid*, 842 F.2d at 1093 (citing *Rushen v. Spain*, 464 U.S. 114, 121, 104 S.Ct. 453, 457, 78 L.Ed.2d 267 (1983)).

468 (1983), the court held that the appellants were not entitled to a new trial where jurors had learned of codefendants' guilty pleas. The court reasoned that, because the appellants' theory of the crime was that the codefendants had committed it, the appellants could not possibly be harmed by the jurors' knowledge of the pleas. *Id.* at 942.

■ We agree with the reasoning of the Seventh Circuit and hold that there was no reasonable possibility that the jurors' extraneous knowledge affected the verdict against LaFleur. It is undisputed that both LaFleur and Holm shot Bloomquist. Because LaFleur's trial defense was that Holm had forced him to participate in the murder, Holm's guilty plea was fully consistent with LaFleur's defense. Indeed, if the information had any effect on the jurors, it would have *supported* LaFleur's claims. The district court, therefore, did not abuse its discretion in denying LaFleur's motion for a new trial.

*Appellants LaFleur and Holm*

Appellants LaFleur and Holm appeal the life sentences they received pursuant to 18 U.S.C. § 1111(b) for the first degree murder of Bloomquist. In sentencing the appellants, the district court determined that § 1111(b) mandates life in prison without the possibility of release. Therefore, the court concluded that it had no discretion to sentence the appellants to any sentence other than life. On appeal, the appellants argue primarily that a mandatory life sentence without the possibility of release is unconstitutional.

■ Our analysis of the legality of the sentences imposed on the appellants, however, must begin at a level prior to any constitutional challenge. Analyzing the language of § 1111(b), we must determine whether the district court correctly determined that the statute mandates a life sentence without the possibility of release for defendants convicted of first degree murder. As this is an issue of statutory interpretation, our review is de novo. *United States v. Valencia–Roldan*, 893 F.2d 1080, 1082 (9th Cir.), *cert. denied*, 495 U.S. 935,

110 S.Ct. 2181, 109 L.Ed.2d 509 (1990). Then, if we conclude that § 1111(b) does indeed mandate a life sentence, we must address the various constitutional arguments presented by the appellants.

### A. *Section 1111(b)'s Pronouncement of a Life Sentence*

18 U.S.C. § 1111 reads in pertinent part:
(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any ... robbery ... is murder in the first degree.

Any other murder is murder in the second degree.

(b) Within the special maritime and territorial jurisdiction of the United States, *whoever is guilty of murder in the first degree, shall ... be sentenced to imprisonment for life ...*

18 U.S.C. § 1111 (emphasis added). Our task in the instant case is to interpret the life sentence imposed pursuant to § 1111(b). Simply stated, we must determine whether § 1111(b) establishes a mandatory minimum sentence of life in prison for a defendant convicted of first degree murder under § 1111(a), or whether a sentencing court has the discretion to impose a sentence of less than life.

We must first consider the sentencing scheme established by Congress with the enactment of the Sentencing Reform Act of 1984, 18 U.S.C. § 3551, *et seq.*, 28 U.S.C. §§ 991–98 (the "Reform Act"), and the corresponding United States Sentencing Guidelines (the "Guidelines"). The Guidelines assign a base offense level of 43 to § 1111(a) first degree murder. U.S.S.G. § 2A1.1. Regardless of a defendant's criminal history category, an offense level of 43 corresponds to a sentence of life in prison. U.S.S.G. Ch. 5, Part A (sentencing table).

■ Under the Guidelines, the sentencing court generally has the discretion to depart downward from the applicable

sentence. 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0. Therefore, where the Guidelines establish a life sentence, if the sentencing court deems a sentence of less than life appropriate and identifies appropriate mitigating circumstances, it may depart downward under § 5K2.0.[7] However, the discretion of the district court to depart is not without limitation. The Guidelines expressly adopt, as the Guideline minimum, any minimum sentence prescribed by statute. *See United States v. Sharp*, 883 F.2d 829, 831 (9th Cir.1989); U.S.S.G. § 5G1.1(b).[8] Therefore, if a criminal statute establishes a minimum sentence for a crime, the sentencing court has no discretion to impose a lesser sentence under § 5K2.0.

The interpretive question in this appeal is easily framed within the Guideline sentencing context. We must determine whether § 1111(b)'s pronouncement of a life sentence is a statutory minimum under § 5G1.1 such that it eliminates the discretion of the sentencing court to impose a sentence of less than life.[9] In interpreting a statute, this court looks first to the plain meaning of the statute in question. *S & M Invest. Co. v. Tahoe Regional Planning Agency*, 911 F.2d 324, 326 (9th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 963, 112 L.Ed.2d 1050 (1991). This "plain meaning rule" is based on the proposition that "in the vast majority of its legislation Congress does mean what it says and thus the statutory language is normally the best

evidence of congressional intent." *Church of Scientology v. United States Dept. of Justice*, 612 F.2d 417, 421 (9th Cir.1979).

Section 1111(b) directs that a defendant convicted of first degree murder "shall ... be sentenced to imprisonment for life...." We find the import of this language clear; a defendant convicted of first degree murder under § 1111(a) must be sentenced to life in prison. The express wording of § 1111(b) leaves the sentencing court no discretion to impose a lesser sentence. We have no doubt that 1111(b) is a minimum sentence within the meaning of § 5G1.1. Life in prison is therefore the established Guideline sentence and appellants LaFleur and Holm were properly sentenced to spend the remainder of their lives in prison. *See United States v. Gonzalez*, 922 F.2d 1044, 1051 (2nd Cir.1991) ("The language of [§ 1111(b)] is clear—life imprisonment is the minimum sentence available for first degree murder under § 1111.").

Nevertheless, we must address certain aspects of the Reform Act which potentially conflict with our conclusion that § 1111(b) provides a minimum life sentence. First, prior to the effective date of the Reform Act and the Guidelines, a defendant sentenced to life under § 1111(b) had a right to be paroled after thirty years in prison. 18 U.S.C. § 4206(d) (repealed 1987).[10] Also, the defendant was eligible

---

7. A sentence of less than life could also be reached under the Guidelines by an adjustment to the base offense level. For example, a defendant with a base offense level of 43 who accepts responsibility pursuant to U.S.S.G. § 3E1.1(a) would be entitled to a two-point offense level reduction. The resulting offense level, 41, would result in a sentencing range which includes sentences of less than life. U.S.S.G. Ch. 5, Part A (sentencing table). However, for simplicity's sake, we will limit our discussion of a sentence of less than life to the discretion of the district court to depart downward under § 5K2.0.

8. Section 5G1.1(b) reads:
 Where a statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence.

U.S.S.G. § 5G1.1(b).

9. The Sentencing Commission appropriately has reserved this question for the courts. The 1990 version of the Guidelines states:
 "Whether a mandatory minimum term of life imprisonment is applicable to every defendant convicted of first degree murder under 18 U.S.C. § 1111 is a matter of statutory interpretation for the courts. The discussion ... regarding circumstances in which a downward departure may be warranted is relevant in the event the penalty provisions of 18 U.S.C. § 1111 are construed to permit a sentence of less than life imprisonment...."
 U.S.S.G. § 2A1.1 (Background).

10. Prior to its repeal, § 4206(d) read:
 Any prisoner, serving a sentence of five years or longer, who is not earlier released under

for parole after serving only ten years of the life sentence. 18 U.S.C. § 4205(a) (repealed 1987).[11] However, as part of the Reform Act, Congress eliminated all federal parole. As a result, under the current sentencing scheme, the sentence imposed on a defendant is the actual amount of time the defendant must serve in prison. Parole is no longer a possibility.

■ We understand that our conclusion that 1111(b) mandates a minimum life sentence, in effect, means that defendants convicted of first degree murder today likely will spend dramatically more time in prison than those convicted of the same crime prior to the Reform Act and its elimination of parole. However, our post-Reform Act interpretation of § 1111(b) is consistent with the pre-Reform Act application of that section. The sentence mandated by § 1111(b) was a minimum sentence even prior to the Reform Act. A sentencing court had no discretion to impose a sentence of less than life; the only pre-Reform Act difference was that the "life" sentence was limited by the terms of federal parole under §§ 4206(d) and 4205(a). The simple fact that parole is no longer available does not alter the plain meaning of § 1111(b). Life in prison is the minimum sentence for the commission of first degree murder.

Second, certain sections of the United States Code, passed in conjunction with the Reform Act, are potentially inconsistent with the notion that § 1111(b) provides a minimum sentence of life in prison. The section entitled "Sentencing Classification of Offenses" reads in pertinent part

(a) *Classification.* An offense that is not specifically classified by a letter grade in the section defining it, is classi-

fied if the maximum term of imprisonment authorized is—

(1) life imprisonment, or if the maximum penalty is death, as a Class A felony;

(2) twenty-five years or more, as a Class B felony;

(3) less than twenty-five years but ten or more years, as a Class C felony;

(4) less than ten years but five or more years, as a Class D felony;

(5) less than five years but more than one year, as a Class E felony;

. . . . .

(b) *Effect of classification.* An offense classified under subsection (a) carries all the incidents assigned to the applicable letter designation, except that, the maximum term of imprisonment is the term authorized by the law describing the offense.

18 U.S.C. § 3559. As the introduction to subparagraph (a) indicates, § 3559 is designed to categorize existing statutes which prescribe maximum sentences. Section 3559(a)(1) defines first degree murder as a Class 'A' felony.

The letter-grade classification of crimes under § 3559 is a system designed by Congress to serve varied sentencing purposes consistent with the Reform Act's goal of creating a uniform sentencing scheme. *See, e.g.,* 18 U.S.C. § 3561(a) (availability of probation for certain classes of crimes); 18 U.S.C. § 3571(b) (appropriate fines for certain classes of crimes); 18 U.S.C. § 3583(b) (appropriate terms of supervised release for certain classes of crimes). One important use of the letter-grade system is in determining the appropriate sentence of imprisonment. In that regard, 18 U.S.C. § 3581 provides in pertinent part:

---

this section or any other applicable provision of law, *shall be released on parole* after having served two-thirds of each consecutive term or terms, or *after serving thirty years of each consecutive term or terms of more than forty-five years including any life term,* whichever is earlier: Provided, however, That the Commission shall not release such prisoner if it determines that he has seriously or frequently violated institution rules and regulations or that there is a reasonable probability that he will commit any Federal, State, or local crime.

18 U.S.C. § 4206(d) (repealed 1987) (emphasis added).

**11.** Prior to its repeal, § 4205(a) read:
Whenever confined and serving a definite term or terms of more than one year, *a prisoner shall be eligible for release on parole* after serving one-third of such term or terms or *after serving ten years of a life sentence* or of a sentence of over thirty years, except to the extent otherwise provided by law.
18 U.S.C. § 4205(a) (repealed 1987) (emphasis added).

(a) *In general.* A defendant who has been found guilty of an offense may be sentenced to a term of imprisonment.

(b) *Authorized terms.* The authorized terms of imprisonment are—

(1) for a Class A felony, the duration of the defendant's life or any period of time;

(2) for a Class B felony, not more than twenty-five years;

(3) for a Class C felony, not more than twelve years;

(4) for a Class D felony, not more than six years;

(5) for a Class E felony, not more than three years;

. . . . . . .

18 U.S.C. § 3581. Section 3581(b)(1) defines the appropriate sentence for Class 'A' felonies as the "duration of the defendant's life *or any period of time.*" 18 U.S.C. § 3581(b)(1) (emphasis added). This prescribed sentence is in potential conflict with our interpretation of § 1111(b) as mandating a minimum life sentence. On the surface, § 3581 contemplates a sentence of less than life for all Class 'A' felonies, including § 1111(a) murder.

■■■ This potential conflict has been the subject of two recent circuit court decisions. *Gonzalez,* 922 F.2d 1044; *United States v. Donley,* 878 F.2d 735 (3d Cir. 1989), *cert. denied,* 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 767 (1990). The issue in both *Gonzalez* and *Donley* was whether § 3581(b)(1) confers on the sentencing court the discretion to impose a sentence of less than life imprisonment for all Class 'A' felonies, including § 1111 first degree murder. In concluding that § 1111(b) mandates a minimum life sentence, both the *Gonzalez* and *Donley* courts reasoned that § 3581's sentencing scheme was inapplicable to first degree murder. *Gonzalez,* 922 F.2d at 1048–51; *Donley,* 878 F.2d at 739–40. We agree that § 3581 does not alter the plain meaning of § 1111(b)'s sentence.

The legislative history of § 3581 indicates that the section speaks only to maximum, not minimum, sentences. The Senate Committee's Report states, "[i]t must be remembered that the terms set forth [in § 3581] are the *maximum* periods for which a judge is authorized to sentence an offender in each [letter grade] category; [the sentences] represent the Committee's judgment as to the *greatest period* the Congress should allow a judge to impose for an offense committed under the most egregious of circumstances." S.Rep. No. 225, 98th Cong., 2d Sess. 114, *reprinted in* 1984 U.S.Code & Admin.News 3182, 3297 (emphasis added); *see Gonzalez,* 922 F.2d at 1050; *Donley,* 878 F.2d at 740. Given this general congressional intent, we find it unreasonable to interpret § 3581 as modifying the express minimum sentence established by Congress in § 1111(b).

■■ Further, § 3581 is simply not intended to modify established statutory sentences. Section 3559 was enacted to assign letter grades to crimes which had prescribed statutory sentences. Congress determined that it was not feasible to amend all such statutes in order to create a totally uniform system of crime classification; instead, it decided that a general provision such as § 3559 was preferable. *Gonzalez,* 922 F.2d at 1050. As the *Donley* court explained in detail, the maximum sentences prescribed by 3581 do not apply to those crimes given a letter classification for the first time by § 3559.[12] *Donley,* 878 F.2d at 740; *see also Gonzalez,* 922 F.2d at 1050. Section 3581's sentences are only applicable to those criminal statutes in which Congress has provided a letter grade classification. There is no indication that § 3581 was intended to modify clearly established statutory sentences. Therefore, we find that the language "or any period of time" in § 3581(b)(1) does not alter the minimum life sentence prescribed in § 1111(b).

---

**12.** In determining that § 3559 and § 3581 address different sets of crimes, the *Donley* court focused on a comparison of § 3559's classification ranges to § 3581's sentences. For example, Class 'C' felonies are those with a maximum sentence of ten to twenty-five years. 18 U.S.C. § 3559(a)(3). However, § 3581 establishes a maximum sentence of 12 years for Class 'C' felonies. 18 U.S.C. § 3581(b)(3). *Donley,* 878 F.2d at 740.

B. *The Appellants' Constitutional Challenges to § 1111(b)'s Minimum Life Sentence*

Appellants LaFleur and Holm raise various constitutional challenges to the mandatory minimum life sentence prescribed in 1111(b). They argue that a mandatory minimum life sentence violates 1) the Eighth Amendment's cruel and unusual punishment clause, 2) the Fifth Amendment's equal protection of laws component, and 3) the Fifth Amendment's guarantee of procedural and substantive due process. We address each argument in turn.

### 1. Cruel and Unusual Punishment

 LaFleur and Holm contend that § 1111(b)'s minimum sentence constitutes cruel and unusual punishment under the Eighth Amendment. The appellants argue that the Constitution guarantees their right to present mitigating evidence to the sentencing court, which must be able to consider the evidence and impose a sentence of less than life when appropriate. The appellants base their argument on Supreme Court decisions involving the individualized nature of capital punishment.

The Supreme Court has held that the Eighth Amendment demands that a sentencing court be allowed to consider mitigating evidence before imposing the death penalty. *Penry v. Lynaugh*, 492 U.S. 302, 317, 109 S.Ct. 2934, 2945, 106 L.Ed.2d 256 (1989) ("[T]he Eighth Amendment mandates an individual assessment of the appropriateness of the death penalty."); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). Underlying this rule is the "principle that punishment should be directly related to the personal culpability of the criminal defendant." *Penry*, 492 U.S. at 319, 109 S.Ct. at 2947. The appellants essentially argue that this rule, applicable to capital punishment cases, should be extended and applied to mandatory life imprisonment sentences. In other words, they argue that the Eighth Amendment demands an *individual* assessment of the appropriateness of a life sentence under § 1111(b).

The Supreme Court has recently decided this issue. In *Harmelin v. Michigan,* —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), the Court examined the identical issue with regard to a mandatory life sentence imposed under a Michigan statute for possession of cocaine. The appellant argued that it was cruel and unusual punishment for a life sentence to be imposed without the consideration of mitigating factors. The Court, in rejecting the appellant's argument, determined that individualized sentences are only required in capital cases and refused to apply the capital punishment doctrine to a non-capital case. *Id.* at ——, 111 S.Ct. at 2701–02. The court explained that there is a "qualitative difference between death and all other penalties." *Id.* at ——, 111 S.Ct. at 2702; *see also Coleman v. McCormick*, 874 F.2d 1280, 1288 (9th Cir.), *cert. denied*, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989) ("The finality and severity of a death sentence makes it qualitatively different from all other forms of punishment."). Under *Harmelin*, it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment. *See Harmelin*, —— U.S. at ——, 111 S.Ct. at 2707 (concurring opinion) (life sentence for cocaine possession does not violate Eighth Amendment because not "grossly disproportionate" to crime). The appellants' Eighth Amendment argument therefore fails.

### 2. Equal Protection

 The appellants contend that § 1111(b) unconstitutionally denies them the equal protection of the laws. The Fifth Amendment to the Constitution includes an equal protection component, *Bolling v. Sharpe*, 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954), which requires that the federal government "accord every person within its jurisdiction equal protection of the laws." *Christy v. Hodel*, 857 F.2d 1324, 1331 (9th Cir.1988), *cert. denied*, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989). Equal protection claims under the Fifth Amendment are treated the same as those under the Fourteenth Amendment. *San Francisco Arts & Athletics v. United*

*States Olympic Committee*, 483 U.S. 522, 542 n. 21, 107 S.Ct. 2971, 2984 n. 21, 97 L.Ed.2d 427 (1987). The appellants base their equal protection claim on a comparison of § 1111(b) to 21 U.S.C. § 848(e), which provides for a sentence of between twenty years and death for a defendant convicted of intentional murder in furtherance of a continuing criminal enterprise.[13] The appellants' claim is essentially that, by virtue of 1111(b)'s mandatory life sentence, they are being treated differently than similarly situated defendants under § 848(e).

Because § 1111(b) neither classifies persons by suspect classes nor classifies in such a way as to impair the exercise of a fundamental right, we apply the rational basis test to the appellants' claim. *See generally Christy*, 857 F.2d at 1331. There clearly exist rational reasons for Congress to prescribe different penalties under § 1111(b) and § 848(e). Simply stated, the statutes, while both punishing murder, address crimes with different elements and different ranges of culpability. Section 848(e), passed in 1988, is primarily aimed at the drug trade and deterring murder in that arena. To be guilty of § 848(e) murder, a defendant must either have been a member of a continuing criminal enterprise or have been engaged in a drug crime. To be guilty of § 1111(a) murder, a defendant must have killed within a federal jurisdiction. Most importantly, § 848(e), which covers persons who have various roles in a murder, covers a broader range of culpability than does § 1111(a), which attaches only to the actual killer. Given the differences between these statutes, Congress certainly has a rational basis for prescribing different punishments, and for allowing sentencing discretion under § 848(e). There is no equal protection violation.

### 3. Due Process

The appellants claim that § 1111(b)'s sentence violates the procedural and substantive due process guaranteed by the Fifth Amendment. The claim is meritless. The appellants make the same argument for a due process violation that they made in support of their cruel and unusual punishment contention. Because we have already addressed that argument, we summarily state here that there is simply no procedural or substantive due process violation in § 1111(b)'s mandate of a mandatory life sentence.[14]

### CONCLUSION

The judgments of the district court are affirmed. Appellant LaFleur was not entitled to a voluntary manslaughter instruction; duress cannot mitigate § 1111(a) murder to manslaughter. LaFleur was not entitled to a new trial; there is no reasonable possibility that the jurors' knowledge of appellant Holm's guilty plea affected the verdict. Section 1111(b) mandates a minimum sentence of life in prison for defendants convicted of first degree murder. The mandatory minimum sentence is constitutional.

---

**13.** Section 848(e) reads in part:
(1) in addition to the other penalties set forth in this section—
(A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) or section 960(b)(1) [21 USCS § 841(b)(1)(A) or 960(b)(1) ] who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death ...
21 U.S.C. § 848(e)(1).
**14.** As part of their due process argument, the appellants contend that there is an unconstitutional conflict between § 1111(b) and 18 U.S.C. § 3661, which reads:
No limitations shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.
18 U.S.C. § 3661. However, § 1111(b) does not place a "limitation" on the type of information which a defendant could present to the district court. Section 1111(b) simply removes the discretion from a sentencing judge when sentencing defendants convicted of first degree murder. There is no unconstitutional conflict between §§ 1111(b) and 3661.

William A. NORRIS, Circuit Judge, concurring in part and dissenting in part:

I concur in Part I of the majority opinion ("Appellant LaFleur"), but dissent from Part II ("Appellants LaFleur and Holm").

The majority interprets 18 U.S.C. § 1111(b) as imposing a minimum sentence of life imprisonment for first degree murder and not allowing for downward departures for any mitigating circumstances. Although it is distinctly possible that the Supreme Court would consider this strict interpretation of the statute constitutional under its recent opinion in *Harmelin v. Michigan,* —— U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991), I see no reason why we should adopt this construction as a matter of statutory interpretation. We have available to us an equally permissible construction of the statute that permits downward departures for mitigating circumstances from the presumptively applicable sentence of life imprisonment. The rule of lenity counsels that we opt for this alternate construction.

It is undisputed that, under U.S.S.G. § 5G1.1, "when a statute requires a sentence different than that set by the guidelines, the statute controls." *United States v. Sharp,* 883 F.2d 829, 831 (9th Cir.1989) (per curiam). The question in this case, however, is what the statute requires, i.e. whether or not Congress intended courts to consider mitigating circumstances according to the procedures under the Sentencing Guidelines when they sentence defendants for violations of 18 U.S.C. § 1111(a). This is an unresolved issue of statutory interpretation that we must address.

The Guidelines themselves acknowledge that Congress left the issue open for the courts to resolve. U.S.S.G. § 2A1.1 sets the base offense level for first degree murder at level 43, which corresponds to a life sentence. The background commentary provides:

The maximum penalty authorized by 18 U.S.C. § 1111 for first degree murder is death or life imprisonment. *Whether a mandatory minimum term of life imprisonment is applicable to every defendant convicted of first degree murder under 18 U.S.C. § 1111 is a matter of statutory interpretation for the courts.* The discussion in application Note 1, *supra,* regarding circumstances in which a downward departure may be warranted is relevant in the event the penalty provisions of 18 U.S.C. § 1111 are construed to permit a sentence less than life imprisonment.

(Emphasis added).

The legislative history also demonstrates that this is a wide open issue. As the majority acknowledges, before the Guidelines were enacted, the life sentence prescribed by 18 U.S.C. § 1111 was not a "mandatory minimum," but was qualified by the parole statute, which allowed those convicted under 18 U.S.C. § 1111 for first-degree murder to be eligible for parole after serving 10 years. *See* 18 U.S.C. § 4205(a) (repealed effective Nov. 1, 1987). Thus, before the Guidelines were enacted, 18 U.S.C. § 1111(b) did allow postsentencing consideration of mitigating factors through the institution of parole.

Congress repealed the parole statute and replaced it by the Guidelines. *See* U.S.S.G. at 1.2. The question before us, I submit, is whether the life sentence should now be construed to be a "mandatory minimum" sentence not subject to the downward adjustment and downward departure provisions of the Guidelines, or whether it should be considered a presumptively applicable sentence to be imposed according to the usual Guidelines procedures.

As a matter of common sense, it seems that if Congress repealed the parole statute without changing the language of 18 U.S.C. § 1111, it assumed that the usual Guidelines sentencing procedures would apply in place of the old parole procedures, including consideration of reductions and departures.[1] Just as prior to 1987, 18

---

1. Although Congress repealed the parole statute in 1984, the repeal did not become effective until November 1, 1987, the day the Guidelines went into effect. Pub.L. 98–473, Title II, § 218(a)(5), Oct. 12, 1984, 98 Stat. 2027. This timing lends further support to the view that Congress intended to replace one general sentence mitigation mechanism with another. In-

U.S.C. § 1111 could not be read independently of the parole provision, today it cannot be read independently of the Guidelines. Until the parole provision was repealed, every defendant was eligible for release on parole "after serving one-third of [his sentence] or after serving ten years of a life sentence or of a sentence over thirty years." 18 U.S.C. § 4205 (repealed). Today, every defendant convicted under these statutes is eligible for adjustments and departures provided for in the Guidelines.

The majority interprets the Congressional repeal of the parole in a general bill overhauling sentencing practices as imposing a mandatory minimum of life imprisonment in a very specific criminal statute. What the majority overlooks is the fact that Congress, in repealing the parole statute and adopting the Guidelines, did not revise each substantive criminal statute individually. Instead, Congress replaced one general mechanism for mitigation of sentences (parole) with another mechanism (Guidelines adjustments and departures). This indicates a Congressional intent that sentences be determined solely by a defendant's conduct up to the day of sentencing, rather than by his conduct during the time he spends in jail. It does not, in any way, indicate a Congressional intent to raise the effective penalty for substantive criminal statutes.

Absent specific Congressional language, we should not impute to Congress so lightly the intent to transform an effective statutory penalty range of 10 years to life (which frequently resulted in a period of incarceration of *less* than life imprisonment) into a mandatory penalty of life (which will *always* result in a life-long period of incarceration). If Congress intended such a draconian result of raising an effective statutory minimum of ten years to life imprisonment and overlooking the particular mitigating characteristics of all defendants, would not a reasonable Congress have said so? I fail to see why a reasonable court should read such an intent into the mere replacement of one general penal scheme with another.

Moreover, resolving this ambiguity in 18 U.S.C. § 1111(b) as imposing a statutory minimum of life imprisonment "would violate the established rule of construction that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'" *See Simpson v. United States*, 435 U.S. 6, 14, 98 S.Ct. 909, 913, 55 L.Ed.2d 70 (1978) (citing to *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971)); *see also Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971).

Until today, our court had not had an opportunity to consider whether pre-Guidelines statutes mandating minimum sentences *with possibility of parole* should be construed as mandating minimum sentences without possibility of downward adjustments and downward departures for mitigating circumstances. All cases that have held that statutory minimums are Guidelines minimums have involved post-Guidelines statutes or pre-Guidelines statutes that did not provide for parole in the first place. *See, e.g., United States v. Williams*, 939 F.2d 721, 726 (9th Cir.1991) (holding that 28 U.S.C. § 841(b)(1)(B), which requires a mandatory minimum of ten years without eligibility of parole for repeat narcotics offenders who trade in certain specified drugs, does not allow for a Guidelines adjustment or departure below this minimum); *United States v. Beltran–Felix*, 934 F.2d 1075, 1077 (9th Cir. 1991) (same); *United States v. Sharp*, 883 F.2d 829 (9th Cir.1989) (same). The calculus for these cases is, of course, very different because, unlike statutes that provided for parole, these statutes always required an *effective* minimum sentence that corresponded to the statutory minimum.

deed, in determining the Guidelines sentencing ranges for particular crimes and promulgating the factors that justify adjusting those ranges, the Sentencing Commission did not limit its inquiry to pre-Guidelines sentencing practices in federal courts, but also examined parole guidelines and practices of parole boards. *United States Sentencing Commission, Guidelines Manual* 1.5, 1.10 (1990).

In sum, the majority transforms a statute mandating a 10–year to life sentence for first-degree murder into a statute requiring life imprisonment. As I understand it, the majority believes that Congress, without ever saying so or even considering the issue, intended that the state lock up all persons convicted of first-degree murder and throw away the key.

I find it particularly troubling that the majority rushes to interpret a statute as mandating a statutory minimum sentence of life imprisonment at a time when the Sentencing Commission is calling on Congress to repeal all statutory minimums. *See United States Sentencing Commission, Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* iv, 118–24 (1991) (prepared by the Commission as directed by section 1703 of Public Law 101–647).

The Commission report considers these statutory minimums particularly suspect because it has found that their operation has racially disparate effects:

> The disparate application of mandatory minimum sentences in cases in which available data strongly suggest that a mandatory minimum is applicable appears to be related to the race of the defendant, where whites are more likely than non-whites to be sentenced below the applicable mandatory minimum....

*Id.* at ii. In conducting a careful analysis, the Report found that "[t]he statistically significant relationship between race and sentence above or below mandatory minimum remained" even after all other variables were controlled. *Id.* at 82 & n. 124; *see also id.* F–1 to F–4 (Appendix F: Technical Discussion of the Probit Analysis).

In light of the foregoing, I respectfully dissent from the majority's unnecessarily harsh construction of the statute as indiscriminately requiring a mandatory sentence of life imprisonment without eligibility of parole for *all* defendants convicted of first-degree murder under 18 U.S.C. § 1111(a). Not only does this construction totally disregard the rule of lenity, but it is also inconsistent with the sentencing structure established by the Sentencing Reform Act.