

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-14-2005

# USA v. Naovasaisri

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-2540

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Naovasaisri" (2005). *2005 Decisions.* Paper 409.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/409

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 04-2540

———

UNITED STATES OF AMERICA

v.

NANTAWAT NAOVASAISRI,

Appellant.

———

On Appeal from the United States District Court
for the District of New Jersey
(Crim. No. 01-CR-701-2)
District Judge: Honorable Joseph E. Irenas

———

Submitted Under Third Circuit LAR 34.1(a)
September 30, 2005

Before: RENDELL, FUENTES, and WEIS, Circuit Judges.

(Filed: October 14, 2005)

———

OPINION OF THE COURT

———

FUENTES, Circuit Judge.

Nantawat "Jack" Naovasaisri appeals from his conviction and sentencing on sex-trafficking and attempted murder charges. In particular, he challenges his conviction for attempted murder of a federal agent and soliciting murder-for-hire on two related grounds: first, he argues that the District Court erred in granting the Government's motion in limine to preclude him from asserting a defense of duress to the attempted murder charges; and second, he argues that the District Court erred in refusing to administer a jury instruction on the defense of duress after he testified at trial that his cellmate assaulted him and threatened him with death and/or physical violence. Naovasaisri also challenges his sentence under United States v. Booker, 125 S. Ct. 738 (2005). For the reasons stated below, we will affirm his conviction, but remand for resentencing in light of Booker.

## I. Background

As we write solely for the parties, our recitation of the facts will be limited to those necessary to our determination. On October 23, 2001, a team of FBI agents, headed by Special Agent Joseph Gilson, arrested Naovasaisri and his girlfriend in San Diego, California, in connection with an investigation of an international Thai sex-trafficking organization.[1] Following Naovasaisri's arrest, Special Agent Gilson interviewed and took

---

[1]The organization recruited and smuggled impoverished Thai women into the United States to serve as prostitutes at brothels, massage parlors, and tanning salons, including some in Atlantic City, New Jersey.

a statement from him. On October 30, 2001, a federal grand jury sitting in Newark, New Jersey returned a one-count Indictment charging Naovasaisri with conspiracy to transport Thai aliens within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii), and conspiracy to transport Thai aliens in interstate and foreign commerce for prostitution in violation of 18 U.S.C. § 2421. Naovasaisri was eventually arraigned in New Jersey on December 28, 2001; Special Agent Gilson was present at the proceeding. Naovasaisri was then detained in the Federal Detention Center in Philadelphia ("FDC-Philadelphia").

On January 6, 2002, Ronald Johnson, an FDC-Philadelphia detainee in a separate case, sent a letter to the U.S. Attorney's Office for the District of New Jersey stating that his cellmate, Naovasaisri, told him, inter alia, that he wanted Johnson to find him a hitman to kill the FBI agent assigned to his case. According to Johnson, Naovasaisri described the FBI agent's physical appearance and referred to him as "Joe." Johnson met with FBI and INS agents on January 25, 2002, and described to them Naovasaisri's plot to hire someone to kill the FBI agent whose description matched that of Special Agent Gilson. Johnson told them that Naovasaisri said that if Special Agent Gilson were killed, the case against him would be dismissed and that he would pay for the murder once the money seized in the underlying case was returned to him. Johnson gave the agents a letter written by Naovasaisri stating that he needed Special Agent Gilson killed immediately and discussing how he intended to pay for the murder.

On February 1, 2002, the FBI instructed Johnson that, if Naovasaisri approached

him again to hire someone to kill Special Agent Gilson, he should say that his "Uncle Mo" (in reality an undercover FBI agent) might be willing to do it. Later that week, Naovasaisri gaive Johnson a letter for him to give to his Uncle Mo discussing how Naovasaisri would pay for the murder and concluding, "If I not in jail I do [Special Agent Gilson] my self but I in jail. I need you trus [sic] me."

On February 8, 2002, Naovasaisri spoke by telephone from FDC-Philadelphia to an undercover FBI agent whom Johnson introduced as his Uncle Mo. Naovasaisri discussed hiring Uncle Mo to kill Special Agent Gilson, whom he referred to as "Bald Eagle," and how he would pay for the proposed murder. During the following months, Naovasaisri exchanged several letters with Uncle Mo through Johnson. Some were in Thai—Johnson could not speak or write Thai but was instructed to tell Naovasaisri that Uncle Mo had a friend who could read Thai—and others were in English. The focus of the correspondence was how Naovasaisri could pay Uncle Mo for Special Agent Gilson's murder. Eventually, Naovasaisri offered his Infiniti automobile to Uncle Mo as a down payment.

On July 19, 2002, Johnson, at the FBI's instructions, told Naovasaisri that Uncle Mo was ready to murder Bald Eagle and wanted confirmation that the Infiniti would be available to help him escape to Mexico after the murder. In a subsequent letter to Uncle Mo, Naovasaisri wrote that he had told his sister to "give you my car I want you to do Bald Eagle." Naovasaisri gave Uncle Mo his sister's home address and cellphone

4

number, and said that Bald Eagle's last name was "gilnson or gilson."[2]

On August 1, 2002, Uncle Mo called Naovasaisri's sister in California to discuss picking up the Infiniti from her. Naovasaisri's sister claimed that she was waiting for a telephone call from Naovasaisri before she would turn over the car. Shortly thereafter, the sting operation ended, and Naovasaisri was moved to another cell and informed that he faced charges of attempted murder and soliciting murder-for-hire. It was at that point that Naovasaisri began suggesting that the plot to kill Special Agent Gilson was Johnson's idea, and that Johnson had forced him to participate in it.

On April 23, 2003, a federal grand jury returned a five-count Superseding Indictment that charged Naovasaisri with the following crimes: transportation of aliens within the United States, pursuant to 8 U.S.C. § 1324(a)(1)(A)(ii); transportation of aliens in interstate commerce for prostitution, pursuant to 18 U.S.C. § 2421; conspiracy to transport aliens, pursuant to 18 U.S.C. § 371; attempt to kill a United States officer, pursuant to 18 U.S.C. § 1114; and use of mail to facilitate a murder, pursuant to 18 U.S.C. § 1958.

Prior to trial, Naovasaisri gave notice that he intended to assert a duress defense to Counts Four and Five, the attempted murder charges. According to Naovasaisri, Johnson

---

[2]However, in the only letter to Naovasaisri's sister on this issue, Naovasaisri wrote that if anyone came for the car, she should "simply insist that you don't know anything about it and let them contact me." As the Government points out, this letter may have been written in August, after the sting operation concluded.

forced him to write letters to, and engage in a telephone conversation with, Johnson's

Uncle Mo, the undercover FBI Special Agent posing as a hitman. On December 1, 2003,

the Government filed a motion in limine to preclude Naovasaisri's defense of duress.

After conducting an evidentiary hearing on December 4, 2003, at which Naovasaisri

declined to testify, the District Court granted the Government's motion.

Naovasaisri's jury trial commenced on December 4, 2003. On December 17,

2003, the jury convicted Naovasaisri on all five counts contained in the Superseding

Indictment. On December 23, 2003, Naovasaisri moved for a new trial, pursuant to Rule

33 of the Federal Rules of Criminal Procedure, arguing that the District Court erred in

refusing to permit the defense of duress at trial. The District Court denied the motion on

January 21, 2004. On May 21, 2004, after imposing a sentencing enhancement for

obstruction of justice, the District Court sentenced Naovasaisri under mandatory

Sentencing Guidelines to 210 months' imprisonment to be followed by three years of

supervised release. This appeal followed.

## II. Discussion

Naovasaisri asserts three challenges to his conviction and sentence. First, he

claims that the District Court erred when it granted the Government's motion in limine to

preclude him from asserting a defense of duress to the attempted murder charges.

Second, he claims that the District Court erred when it refused to administer a jury

instruction on the defense of duress after he testified at trial that his cellmate assaulted

6

him and threatened him with death and/or physical violence.  Finally, he claims that he is entitled to resentencing under Booker.  These arguments are addressed in turn.

A.     The Duress Defense

Naovasaisri argues that he was denied due process of law and a fair trial as guaranteed by the Fifth and Sixth Amendments to the U.S. Constitution when the District Court granted the Government's motion in limine to preclude the defense of duress at trial.  The Government contends that, under federal law, duress is never a defense to crimes that require the intent to commit murder and, in the alternative, that Naovasaisri failed to make out a prima facie case of duress sufficient to entitle him to present the issue to the jury.

Whether the defense of duress is available, as a matter of law, to a charge of attempted murder is a question of first impression in this circuit.[3]  However, we need not reach the question here because we agree with the District Court that, even if duress was a defense available to Naovasaisri, he was not entitled to present the defense to the jury

_____

[3]As the Government points out, every Circuit to decide whether duress or coercion is a defense to crimes requiring the intent to commit murder has concluded that it is not. See United States v. LaFleur, 971 F.2d 200, 206 (9th Cir. 1991) (holding that "consistent with the common law rule, a defendant should not be excused from taking the life of an innocent third person because of the threat of harm to himself"; "duress is not a valid defense to § 1111(a) first degree murder"); United States v. Buchanan, 529 F.2d 1148, 1153 (7th Cir. 1975) (holding that "coercion is not a defense to murder" under 18 U.S.C. § 1114); R.I. Rec. Ctr., Inc. v. Aetna Cas. & Sur. Co., 177 F.2d 603, 605 (1st Cir. 1949) (observing that it is "established" that "coercion or necessity will never excuse taking the life of an innocent person").

because he failed to make out a prima facie case of duress.

Where "an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense." United States v. Bailey, 444 U.S. 394, 416 (1980). This rule applies where, as here, the issue is raised in a pretrial motion. See United States v. Miller, 59 F.3d 417, 421 n.1 (3d Cir. 1995) ("A court may rule on a pretrial motion to preclude a defendant from presenting a duress defense where the government contends that the evidence in support of that position would be legally insufficient.").

To assert a defense of duress at trial, Naovasaisri was required to proffer evidence showing: "(1) an immediate threat of death or serious bodily injury; (2) a well-grounded fear that the threat will be carried out; and (3) no reasonable opportunity to escape the threatened harm." Miller, 59 at 422 (quoting United States v. One 107.9 Acre Parcel of Land, 898 F.2d 396, 399 (3d Cir. 1990)). The Miller Court also recognized a fourth element of duress: "that a defendant should not recklessly place h[im]self in a situation in which [he] would be forced to engage in criminal conduct." Id. (citing United States v. Paolello, 951 F.2d 537, 541 (3d Cir. 1991)).

In view of the evidence presented at the pre-trial hearing and during the trial, we agree with the District Court's conclusion that Naovasaisri failed to proffer evidence that he had "no reasonable opportunity to escape the threatened harm." Naovasaisri declined

8

to testify at the pre-trial hearing and he proffered only an unsworn statement that Johnson had threatened his life and that he was afraid Johnson would carry out the threat. The Government, on the other hand, called a Bureau of Prisons official from FDC-Philadelphia to testify about the opportunities Naovasaisri had to inform FDC-Philadelphia staff of Johnson's threats and seek protection from Johnson. At the conclusion of the evidentiary hearing, the District Court first ruled that duress is not a defense to murder or attempted murder. The District Court also ruled, in the alternative, that Naovasaisri failed to establish a prima facie case of duress. Specifically, the District Court found that Naovasaisri had not presented evidence showing that there was "no reasonable opportunity to escape the threatened harm."[4]

Despite the District Court's ruling on the Government's motion in limine, Naovasaisri was permitted to testify at trial about Johnson's alleged threats. However, on cross-examination, Naovasaisri conceded that he had numerous opportunities to report the threats and seek protection from Johnson. For example, Naovasaisri testified that his cell was equipped with a "duress button" that, if pressed, would have immediately summoned FDC-Philadelphia officials, and that a prison guard was stationed in his unit around the clock. He also testified that he met with or saw numerous individuals during the eight-

---

[4]According to the District Court, "there are numerous opportunities to make known to prison officials you're having a problem, that you feel threatened. And it's also clear that they will act and they will not take a risk; in other words, they won't say, [']well this is false, therefore go back to your cell.[']"

month period specified by the Superseding Indictment—he met with his attorney, representatives of the Royal Thai Consulate, and FDC-Philadelphia counselors and medical personnel. In addition, Naovasaisri wrote letters to his sister in Thai, which he knew Johnson did not understand, and spoke to her on the telephone on an almost daily basis. Furthermore, Naovasaisri conceded that if he had told FDC-Philadelphia officials about Johnson's threats, he and Johnson would have been separated immediately and placed into different cell blocs. Nonetheless, Naovasaisri never complained to anyone about Johnson's threats until after he was charged with attempting to hire someone to kill Special Agent Gilson. Nor did he present evidence that it would have been unreasonable for him to report Johnson's threats.[5] For these reasons, we find that the District Court did not err when it precluded Naovasaisri from presenting a defense of duress at trial because he failed to establish a prima facie case of duress.[6] See Miller, 59 F.3d at 422 (rejecting

---

[5]Rather, he offered only speculation that he would have been harmed if he reported Johnson's threats. Cf. United States v. Riffe, 28 F.3d 565, 568 (6th Cir. 1994) (ruling that a duress defense was available where defendant "had a well-founded fear that going to prison officials might have placed him in more danger"). In Riffe, the defendant testified that the basis for his belief that prison officials could not protect him if he refused to smuggle marijuana into the prison for gang members was that he had been previously stabbed in the chest while "in protective segregation after giving up a name to prison officials," and a friend was murdered "after a similar incident in another institution." Id.

[6]Naovasaisri also argues that the District Court erred because it "seemingly adopted a per se ban on a duress defense in situations where the threatened individual is an inmate with the potential for informing prison officials of the sitautiton." (NB at 18 (citing Riffe, 28 F.3d 565.) On the contrary, the District Court did not adopt such a per se ban; rather, it ruled, inter alia, that Naovasaisri had failed to proffer evidence that he lacked "a reasonable opportunity to go to law enforcement, . . . make known [his] fear and get protection."

10

duress defense where defendant failed to report threats despite having "ample opportunity . . . to communicate her claims of duress to law enforcement officials"); see also Bailey, 444 U.S. at 410 ("[I]f there was a reasonable, legal alternative to violating the law 'a choice both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses [of duress and necessity] will fail.") (citation omitted).

B.     The Jury Charge

Naovasaisri next contends that the District Court's refusal to instruct the jury on the defense of duress denied him his fundamental constitutional rights to a fair trial and due process of law. "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." Mathews v. United States, 485 U.S. 58, 63 (1988). Putting aside the question whether duress is a "recognized defense" to attempted murder, there was not "evidence sufficient for a reasonable jury to find" in Naovasaisri's favor on a defense of duress, as discussed above. Accordingly, Naovasaisri was not entitled to a jury instruction on the defense of duress.

Naovasaisri also suggests that the jury instruction given by the District Court served to confuse the jury with respect to the issues of duress and coercion. After permitting Naovasaisri to testify about Johnson's threats, the District Court instructed the jury that, although duress was not a defense to the attempted murder charges, the jury could "consider evidence of coercion or duress in deciding whether or not [Naovasaisri],

11

in fact, acted with the intent to have Mr. Gilson murdered."

The District Court first provided counsel with a proposed charge on duress during Naovasaisri's testimony. The District Court also advised counsel that they would have two chances to object to particular charges: during the charge conference and after the charge was read to the jury. At the charge conference, Naovasaisri's counsel stated that he found "the charge to be fine in all respects, even including" the charge concerning duress. Similarly, after the District Court read the charge to the jury, Naovasaisri's counsel indicated that he had "no objections" to the charge. Thus, because Naovasaisri did not object to the charge at trial, he must demonstrate plain error, see Untied States v. West Indies Transport, Inc., 127 F.3d 299, 311 (3d Cir. 1997), which he has failed to do.

C.      Naovasaisri's Sentence

By letter dated May 23, 2005, Naovasaisri requests a remand for resentencing under United States v. Booker, 125 S. Ct. 738 (2005). Naovasaisri also argues that, because he committed his offense before the Supreme Court decided Booker, the ex post facto principles inherent in the Due Process Clause of the Fifth Amendment prevent the re-imposition of a sentence that includes an obstruction-of-justice enhancement. In a reply letter dated July 25, 2005, the Government consents to Naovasaisri's request for a remand and resentencing under Booker but urges this Court to follow the Fifth, Seventh, and Eleventh Circuits and reject Naovasaisri's ex post facto argument. See United States v. Jamison, 416 F.3d 538 (7th Cir. 2005); United States v. Scroggins, 411 F.3d 572 (5th

12

Cir. 2005); <u>United States v. Duncan</u>, 400 F.3d 1297 (11th Cir. 2005).

Having determined that issues with respect to <u>Booker</u> are best determined by the District Court in the first instance, we vacate the sentence and remand for resentencing in accordance with that opinion.

## III. Conclusion

For the reasons discussed above, we affirm Naovasaisri's conviction, but vacate his sentence and remand for resentencing.