Ismael R. **GONZALEZ**, Petitioner,

v.

**K.W. PRUNTY, Warden, Respondent.**

**No. CV 95–8053–RMT(RC).**

United States District Court, C.D. California.

March 19, 1997.

Michael Tanaka, Deputy Federal; Public Defender, Los Angeles, CA, for Plaintiff.

William M. Wood, Deputy Attorney General, California Office of the Attorney General, San Diego, CA, for Defendants.

## JUDGMENT

TAKASUGI, District Judge.

Pursuant to the Order of the Court adopting the findings, conclusions, and recommendations of United States Magistrate Judge Rosalyn M. Chapman,

IT IS ADJUDGED that the Petition for Writ of Habeas Corpus is denied and the action is dismissed with prejudice.

## ORDER ADOPTING REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Pursuant to 28 U.S.C. Section 636, the Court has reviewed the Petition and other papers along with the attached Report and Recommendation of United States Magistrate Judge Rosalyn M. Chapman, and has made a *de novo* determination.

IT IS ORDERED that (1) the Report and Recommendation is approved and adopted; (2) the Report and Recommendation is adopted as the findings of fact and conclusions of law herein; and (3) Judgment shall be entered denying the petition for writ of habeas corpus and dismissing the action with prejudice.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation and Judgment by the United States mail on petitioner, counsel for petitioner and counsel for respondent.

## REPORT AND RECOMMENDATION ON A HABEAS CORPUS PETITION

CHAPMAN, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Robert M. Takasugi, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

## BACKGROUND

### I

On March 26, 1993, petitioner Ismael R. Gonzalez, a state prisoner, was convicted by a jury of first degree murder with the special circumstance of lying-in-wait, in violation of California Penal Code ("P.C.") Sections 187

and 190.2(a)(15).[1] Clerk's Transcript ("CT") 391–92. The jury also found that the petitioner personally used a firearm (P.C. §§ 12022.5(a), 1192.7(c)(8)). CT 393. On May 7, 1993, the trial court sentenced the petitioner to life without the possibility of parole ("LWOP") for the murder with special circumstances, plus a five-year enhancement under P.C. § 12022.5(a) to be served before the life term. CT 431–32, 448–49.

The California Court of Appeal on February 23, 1995, affirmed the conviction in an unpublished opinion.[2] Return, Exh. 3. The petitioner sought review from the California Supreme Court, which denied review on May 18, 1995.[3] Return, Exh. 4.

## II

The California Court of Appeal found the following facts and circumstances underlying petitioner's conviction.[4] At the time of the crime, the petitioner was 18 years old. On August 19, 1992, the petitioner drove himself and his friends John Sullivan and Franky Perez to a pizza shop where Wendy Armenta worked. After the pizza shop closed, Armenta left with petitioner and his friends. [¶] Ms. Armenta, who had lent her car to Jose Martinez, was angry because Martinez still had her car. The petitioner drove around with Armenta and the others looking for Martinez. They later booked a room at a motel for the night. Sullivan fell asleep and when he awoke the next morning, Armenta was gone and Martinez was in the motel room. [¶] The petitioner, Sullivan, Perez, and Martinez left the motel on the morning of August 20th in the petitioner's pick-up truck. The petitioner had a 9 millimeter Smith and Wesson handgun with him. They drove into the hills. At approximately 7:30 or 8:00 a.m., they stopped at a construction site on a cliff overlooking some trees and Sullivan pointed out the view to Martinez, who walked over to take a look. [¶] The petitioner, who was holding his gun in his hand, approached Sullivan, who was standing near the rear of the truck, and said, "I'm going to fuckin' blow him away." The petitioner then jumped onto the bed of the truck, pointed the gun with both hands at Martinez, and said, "You like to play games. Now the game's turned around. I'm going to blow you away." Martinez was walking back to the truck with his head down, looking at his feet. He did not look up and appeared not to see the gun. Martinez shrugged and "blew it off like [the petitioner] was joking." [¶] The petitioner fired the gun and Martinez grabbed his leg and fell to the ground. He screamed at the petitioner, begging him not to kill him. Martinez tried to crawl under the truck. The petitioner jumped from the truck and shot Martinez in the head. The petitioner told Sullivan, "I'm a real man now." [¶] The petitioner told Sullivan to throw Martinez's body off the cliff. Sullivan told the petitioner, rudely, to do it himself. The petitioner told Sullivan and Perez to get in the truck. The petitioner then drove off running over Martinez's body. The petitioner, Sullivan and Perez drove to the petitioner's girlfriend's house. Perez went inside. Sullivan used a hose to wash Martinez's blood off one of the truck's tires. The petitioner and Sullivan agreed to say nothing about Martinez's death if questioned by police. [¶] That evening, Martinez's body was found at the construction site. There were tire tracks on Martinez's body, and blood was splattered as though by a spinning tire. A bullet was recovered from Martinez's head. Bullet casings were found around the body. The bullets could have been fired from any number of Smith and Wesson models. [¶] On August 25, 1992, Sullivan was arrested on unrelated charges, and released. The police went to Sullivan's home and saw the petitioner's truck in front of the house. They seized the truck when they observed the tire pattern matched tracks at the murder scene. Human blood found on the underside of the truck's wheel well was consistent with Martinez's blood type. Martinez's leg wound was consistent with someone having shot him

---

1. Under P.C. § 190.2(a), a defendant convicted of murder while lying-in-wait may be sentenced to either death or life imprisonment without the possibility of parole.

2. *People v. Gonzalez,* No. E13009 (1995).

3. *People v. Gonzalez,* No. § 045798 (1995).

4. Return, Exh. 3.

while Martinez was walking and Martinez's head wound indicated Martinez was shot from within two feet. A search warrant of Sullivan's residence, where the petitioner had been living for three to six months, turned up a box of shotgun rounds and a live 9 millimeter round.

After the petitioner was arrested, he was interviewed by Detective Stewart of the City of Corona's police department on August 30, August 31, and September 2, 1992. The petitioner was given his *Miranda*[5] rights prior to the first interview on August 30th. CT 161–62. In the August 30th interview, the petitioner denied knowing anything about the killing, and claimed he left Martinez at the motel. Return, Exh. 3 at 43–44. In the August 31st interview, the petitioner expressed a desire to make a telephone call and the following conversation ensued:

[DETECTIVE STEWART]: Who do you want to call?

[PETITIONER]: Ah, my lawyer.

[DETECTIVE STEWART]: You got a lawyer?

[PETITIONER]: Yes, but I have to notify somebody else before I can call my lawyer so I can get the number.

[DETECTIVE STEWART]: [In][o]ther words, you don't want to talk to me without a lawyer[?]

[PETITIONER]: No, I just wanna, I want to talk to my family actually.

[DETECTIVE STEWART]: Okay.

[PETITIONER]: I want to let them know where I'm at.

[DETECTIVE STEWART]: Okay, I tried to give you a phone call last night and you wouldn't tell me who you were going to call, that it was just a friend and you refused to identify him.

[PETITIONER]: And ...

[DETECTIVE STEWART]: And I told you that you had the right to call your family, your mother, or bail bondsman.

[PETITIONER]: That's who I want to call, I want to call my mom.

[DETECTIVE STEWART]: You want to call your mom?

[PETITIONER]: Yes, I do.

[DETECTIVE STEWART]: Okay. Just so the story is clear, you remember your rights I advised you of last know [sic], that you have a right to remain silent and you don't have to talk to me, or if questions come up that you don't want to answer, you don't have to answer that....

[PETITIONER]: Yes.

[DETECTIVE STEWART]: Okay, now do you want to call your mother, or [who] do you want to call, or do you want an attorney to represent you before any question?

[PETITIONER]: I want to call my mom.

\*    \*    \*    \*    \*    \*

[DETECTIVE STEWART]: But I just want to make clear, if you want an attorney before any questioning, then we won't talk any more.

[PETITIONER]: No, I just want to call my mom.

CT 161–62. After the petitioner made his telephone call, the interview continued. CT 162. The petitioner repeated his claim that he had left Martinez at the motel, and he offered no explanation for the blood in the wheel well of his pick-up truck. Return, Exh. 3 at 44.

The Court of Appeal, in its unpublished opinion, further found that on September 2, 1992, Maria Gonzalez, the petitioner's aunt and an officer with the Los Angeles Police Department, telephoned Stewart to inquire whether she could visit the petitioner at the Riverside County jail. Detective Stewart informed her that he had no control over her or over the jail and that she could visit the petitioner only as a relative and not as a police agent. She assured him that she was going to visit the petitioner only as a family member. When speaking with the petitioner, Gonzalez advised him to talk to the police if he had not committed the crime; otherwise, to remain silent, and she would get him an attorney. The petitioner denied that he had shot Martinez and told Gonzalez that he

**5.** *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1627–28, 16 L.Ed.2d 694, *reh'g denied sub nom., California v. Stewart*, 385 U.S. 890, 87 S.Ct. 11, 17 L.Ed.2d 121 (1966).

knew who had. Ms. Gonzalez then advised the petitioner to tell the police, and the petitioner agreed. Ms. Gonzalez telephoned Stewart and informed him that the petitioner wanted to talk to him.

The police then conducted their third and final interview with the petitioner. Before the interview began, Stewart again gave the petitioner his *Miranda* rights. CT 196. The interview proceeded as follows:

[DETECTIVE STEWART]: Ok, also since [the first interview], I believe yesterday you was [sic] arrainged [sic] or appointed a public defender and at that point in time they have assigned you an attorney.

[PETITIONER]: Yes.

[DETECTIVE STEWART]: Ah, before we go any further with any questioning, do you want to have an attorney present?

[PETITIONER]: No.

[DETECTIVE STEWART]: Do you want to talk to an attorney alone before we go any further?

[PETITIONER]: No.

*        *        *        *        *        *

[DETECTIVE STEWART]: Ok, do you think you fully understand your rights?

[PETITIONER]: Yes, I do.

[DETECTIVE STEWART]: And did you waive that you don't want to talk to an attorney right now?

[PETITIONER]: No, I don't.

[DETECTIVE STEWART]: And this is free and voluntary?

[PETITIONER]: Yes.

CT 186–87; Return, Exh. 3 at 51.

The petitioner then changed his story, saying he left the motel with Sullivan, Perez, Martinez and another man. Return, Exh. 3 at 44. The petitioner said Sullivan was driving and he was in the back of the truck with Martinez. *Id.* The petitioner said he fell asleep, and awakened when he heard a gunshot. *Id.* The petitioner claimed he saw Sullivan with his gun. *Id.* The petitioner said he felt the truck move as Martinez tried to crawl under it. *Id.* He also said that Sullivan fired a second shot and then jumped into the driver's seat and drove off with him and Perez, who had been standing near the front of the truck. *Id.* The petitioner said he felt the truck drive over Martinez's body. *Id.*

During the trial, the petitioner's statements were introduced into evidence through the testimony of Detective Stewart. Reporter's Transcript ("RT") 697:15–700:13. The prosecution also called Sullivan as a witness, and Sullivan testified that the petitioner shot Martinez. RT 339:27–345:1. To impeach Sullivan, the petitioner made an offer of proof that, in 1991, Sullivan had threatened to put a bullet hole in his girlfriend's head and that minutes later several gunshots were fired at her house. RT 162:23–163:11. The trial court refused to permit Sullivan to be examined about the threat/gunshot incident because it was unduly time-consuming and more prejudicial than probative. RT 169:25–170:27. However, the trial court did permit Sullivan to be impeached with three pending misdemeanor charges relating to illegal possession of weapons. RT 168:28–169:4, 273:18–21.

The petitioner's defense was based on insufficient evidence. In his defense, petitioner presented a ballistics expert who opined that the person who shot Martinez would have had to have been standing near the front of the truck, not at the right rear passenger side, and that the shot which hit Martinez in the leg had to have been fired from ground level. RT 754:17–755:2, 756:4–757:4.

### III

On November 24, 1995, the petitioner filed the instant habeas corpus petition. The respondents filed their return on January 29, 1996, and the petitioner filed a traverse on March 27, 1996. On July 22, 1996, Magistrate Judge Rosalyn M. Chapman appointed counsel for the petitioner, and ordered further briefing on the constitutionality of P.C. § 190.2(a)(15). The petitioner filed a supplemental brief on November 12, 1996. The respondent's supplemental brief was filed on December 5, 1996, and the petitioner's reply brief was filed on January 6, 1997.

The petitioner seeks habeas corpus relief on four grounds, asserting: (1) that his right

to counsel and his right against self-incrimination were violated when the trial court admitted statements from his August 31, 1992 interview with the police; (2) that his right to counsel and his right against self-incrimination were violated when the trial court admitted statements from his September 2, 1992 interview with the police; (3) that the trial court violated his Sixth Amendment rights to confrontation and cross-examination when it precluded him from impeaching Sullivan with the incident of Sullivan's threat to his girlfriend and the shooting into her house; and (4) that the lying-in-wait special circumstance is unconstitutional.

## DISCUSSION

### IV

■ The petitioner contends that he did not voluntarily waive the *Miranda* warnings and knowingly and intelligently give statements to the police on August 31 and September 2, 1992. Regarding both statements, the petitioner contends that the statements were given in dereliction of his constitutional right to counsel.

■ Once an accused unequivocally invokes his right to counsel, the police must halt their interrogation. *Davis v. United States,* 512 U.S. 452, 456–60, 114 S.Ct. 2350, 2354–55, 129 L.Ed.2d 362 (1994); *Smith v. Illinois,* 469 U.S. 91, 94–95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984); *Robtoy v. Kincheloe,* 871 F.2d 1478, 1482 (9th Cir.1989), *cert. denied,* 494 U.S. 1031, 110 S.Ct. 1483, 108 L.Ed.2d 619 (1990). However, "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis,* 512 U.S. at 459, 114 S.Ct. at 2355 (emphasis added); *United States v. Doe,* 60 F.3d 544, 546 (9th Cir.1995); *United*

States v. Fouche, 776 F.2d 1398, 1405 (9th Cir.1985). Essentially, the suspect must unambiguously request counsel; otherwise, the police questioning may continue. *Davis,* 512 U.S. at 458–64, 114 S.Ct. at 2355–57.

■ Here, petitioner's request to speak to a lawyer was ambiguous and the police were entitled to question him further regarding his actual intent. *Davis,* 512 U.S. at 458–64, 114 S.Ct. at 2355–57. The petitioner's actual intent was to telephone his mother. CT 161–62. A request to telephone one's mother does not invoke the right to counsel. *Fare v. Michael C.,* 442 U.S. 707, 724, 99 S.Ct. 2560, 2571, 61 L.Ed.2d 197, *reh'g denied,* 444 U.S. 887, 100 S.Ct. 186, 62 L.Ed.2d 121 (1979). The record reveals that the petitioner never made an unequivocal request for counsel. Consequently, the petitioner has shown no violation of his right to counsel or his right against self-incrimination at the August 31, 1992 interview.

An accused may knowingly and voluntarily waive his right to counsel, particularly where **he** initiates further contact with the police. *Edwards v. Arizona,* 451 U.S. 477, 482–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378, *reh'g denied,* 452 U.S. 973, 101 S.Ct. 3128, 69 L.Ed.2d 984 (1981); *United States v. Andaverde,* 64 F.3d 1305, 1313–14 (9th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1055, 134 L.Ed.2d 199 (1996). To knowingly and voluntarily waive the right to counsel, an accused must understand that he is relinquishing or abandoning a known right or privilege. *Edwards,* 451 U.S. at 482, 101 S.Ct. at 1884.

■ On September 2nd, the petitioner indicated through his aunt, that he desired to talk with the police.[6] CT 194–95; Return, Exh. 3 at 50–51. An examination of the transcript of the interview shows that petitioner waived his right to counsel and freely and voluntarily gave his statement.[7] The

---

6. The California Court of Appeal found that the petitioner's aunt did not act as an agent of the police to trick the petitioner into testifying. CT 193–95. The petitioner, moreover, has not produced any evidence showing to the contrary.

7. [DETECTIVE STEWART]: Ah, before we go any further with any questioning, do you want to have an attorney present?
[PETITIONER]: No.
[DETECTIVE STEWART]: Do you want to talk to an attorney alone before we go any further?
[PETITIONER]: No.

petitioner further denied that his aunt had in any way influenced his decision to waive his rights.[8] CT 197. Clearly, the petitioner was aware of his right to remain silent and voluntarily and intelligently chose to waive that right. *Edwards,* 451 U.S. at 485–86, 101 S.Ct. at 1885; *Andaverde,* 64 F.3d at 1313–14. There is, thus, no merit to petitioner's claims that his rights to counsel and against self-incrimination were violated.

## V

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him." The confrontation clause of the Sixth Amendment provides a criminal defendant with the right to face those who testify against him and the right to conduct cross-examination. *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987). The Sixth Amendment's confrontation clause applies to the states through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 406, 85 S.Ct. 1065, 1069, 13 L.Ed.2d 923 (1965).

■ The right to confront witnesses serves three purposes: (1) to insure reliability by means of oath, (2) to expose the witnesses to cross-examination, and (3) to permit the trier of fact to weigh the demeanor of the witness. *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970). The confrontation clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective to whatever extent the defense might wish. *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam); *Pavlik v. United States,* 951 F.2d 220, 224 (9th Cir.1991).

■ The confrontation clause does not prevent a trial court from imposing limits on defense counsel's inquiry into the potential bias of a prosecution witness. *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986); *Wood v. Alaska,* 957 F.2d 1544, 1551 (9th Cir.1992). When cross-examination relates to impeachment evidence, the test is whether the jury had sufficient information to appraise the biases and motivations of the witness. *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1435–36; *Bright v. Shimoda,* 819 F.2d 227, 228 (9th Cir.1987), *cert. denied,* 485 U.S. 970, 108 S.Ct. 1246, 99 L.Ed.2d 444 (1988). The federal courts "do not require a trial court to permit cross-examination on topics of very slight or marginal relevance simply upon the theory that bias or prejudice might be disclosed." *Chipman v. Mercer,* 628 F.2d 528, 531 (9th Cir.1980).

■ Here, the trial court, on the grounds it was collateral, unduly time consuming and more prejudicial than probative, excluded evidence regarding a threat Sullivan allegedly made to the effect that he would put a bullet in his girlfriend's head and the incident, a few minutes later, when someone shot at her house. RT 169:25–170:27, 273:18–21. A trial court may exclude unsubstantiated evidence of dubious probative value. *United States v. Dischner,* 974 F.2d 1502, 1514 n. 13 (9th Cir.1992), cert. denied, 507 U.S. 923, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993); *Hughes v. Raines,* 641 F.2d 790, 793 (9th Cir.1981). The trial court, in excluding

---

CT 196.

**8.** [DETECTIVE STEWART]: Ok, I've been in contact with your Aunt, Maria Gonzales, who is present here now. And you know that she is a Detective with the Los Angeles police department.
[PETITIONER]: Yes I do.
[DETECTIVE STEWART]: And she's come and [has] talk[ed] to you about you being in custody.
[PETITIONER]: Yes.
[DETECTIVE STEWART]: Is that correct?
[PETITIONER]: Yes.
[DETECTIVE STEWART]: And in her talking to you, did you relate to her that you wanted to talk to the Corona Police Detectives or myself, Det. Stewart?
[PETITIONER]: Yes I did.
[DETECTIVE STEWART]: Ok, when she talked to you did she make any promises that she could help you out because she is a police officer or do you any favors?
[PETITIONER]: No Sir.
[DETECTIVE STEWART]: Did she tell you that I would do you favors because she is a fellow police officer?
[PETITIONER]: No.
[DETECTIVE STEWART]: Did she tell you that anybody else could do you any favors?
[PETITIONER]: No.
CT 196–97.

this unsubstantiated evidence, did not foreclose Sullivan's impeachment; to the contrary, the trial court allowed the petitioner to impeach Sullivan with his prior arrests on weapons charges, thereby showing his familiarity with weapons. RT 168:28–169:4. The petitioner, however, elected not to impeach Sullivan with his prior arrests and instead impeached him on the basis of prior inconsistent statements. RT 427:25–428:7; 451:11–21.

The petitioner, thus, has failed to show that the proffered impeachment of Sullivan on the collateral issue of his threat to, and later shooting of, his girlfriend's house was essential to permit the jury to appraise Sullivan's biases and motivations, or that the areas allowed for the impeachment of Sullivan were insufficient to permit the jury to do that. *Bright,* 819 F.2d at 228; *Chipman,* 628 F.2d at 530.

## VI

■■ The petitioner was sentenced to life without the possibility of parole ("LWOP") pursuant to the lying-in-wait special circumstance of P.C. § 190.2(a)(15).[9] The petitioner argues that P.C. § 190.2(a)(15) violates the Eighth Amendment and the due process and equal protection clauses of the Fourteenth Amendment because it fails to provide a meaningful basis for distinguishing between a premeditated murder committed while lying-in-wait and "ordinary" premeditated murder. The petitioner's contention is interesting, but lacks merit.

■■ The respondents initially argue that, because the petitioner did not receive the death penalty, he lacks standing to challenge the lying-in-wait special circumstance. However, the respondents are mistaken. Here, the petitioner is challenging his LWOP sentence under P.C. § 190.2(a)(15) by arguing for an application of the cruel and unusual death-penalty jurisprudence to his LWOP sentence. Certainly, the petitioner has standing to argue that this sentence is unconstitutional. *See County Court of Ulster County, New York v. Allen,* 442 U.S. 140,

154–55, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979) ("A party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights").

■■ The Eighth Amendment forbids the infliction of cruel and unusual punishment. Although the Eighth Amendment does not prohibit the death penalty, it does require that a capital sentence "not be imposed under sentencing procedures that create[ ] a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Gregg v. Georgia,* 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). Thus, to satisfy the strictures of the Eighth Amendment, a state's "capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988) (citations omitted); *Zant v. Stephens,* 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983).

Here, the petitioner attempts to apply current death penalty jurisprudence to invalidate his LWOP sentence by arguing that the California courts have so broadly defined the special circumstance of lying-in-wait under P.C. § 190.2(a)(15) that it does not differ from ordinary premeditated murder and, thus, does not reasonably justify the imposition of LWOP. The petitioner contends, in essence, that the ineligibility for parole makes an LWOP sentence qualitatively different than all other sentences except the death penalty, and thus, LWOP should be afforded the same scrutiny applied to the death penalty. *See Harmelin v. Michigan,* 501 U.S. 957, 1001, 111 S.Ct. 2680, 2705, 115 L.Ed.2d 836 (Kennedy, J. concurring) ("a life sentence without parole is the second most severe penalty permitted by law").

Regardless of any theoretical appeal the petitioner's argument might have, it fails because the federal courts have adamantly refused to extend the principles of death-penal-

---

9. At the time of the petitioner's conviction, P.C. § 190.2(a)(15) provided for LWOP when "[t]he defendant intentionally killed the victim while lying in wait."

ty jurisprudence beyond the specific confines of the death penalty. In *Harmelin*, for example, the Supreme Court rejected the prisoner's contention that the Eighth Amendment's requirement that the death penalty not be imposed without an individualized determination of appropriateness should be extended to prisoners sentenced to LWOP. *Harmelin*, 501 U.S. at 994–96, 111 S.Ct. at 2701–02; *See also United States v. LaFleur*, 971 F.2d 200, 211 (9th Cir.1991), *cert. denied*, 507 U.S. 924, 113 S.Ct. 1292, 122 L.Ed.2d 683 ("a mandatory life sentence for murder does not constitute cruel and unusual punishment," even though there is no individual assessment of the sentence); *United States v. Van Winrow*, 951 F.2d 1069, 1071 (9th Cir.1991) (a mandatory sentence of life without the possibility of parole does not violate the Eighth Amendment even though the trial judge is precluded from considering mitigating circumstances). The Supreme Court specifically noted the "qualitative difference between death and all other penalties." *Harmelin*, 501 U.S. at 995, 111 S.Ct. at 2702; *See also Furman v. Georgia*, 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring) ("The penalty of death differs from all other forms of criminal punishment, not in degree but in kind"); *Coleman v. McCormick*, 874 F.2d 1280, 1288 (9th Cir.) ("The finality and severity of a death sentence makes it qualitatively different from all other forms of punishment"), *cert. denied*, 493 U.S. 944, 110 S.Ct. 349, 107 L.Ed.2d 337 (1989).

Regarding the nature of LWOP, the Supreme Court has found that, although "it is the second most severe [sentence] known to the law[,] ... [w]e have drawn the line of required individualized sentencing at capital cases, and see no basis for extending it further [to LWOP]." *Harmelin*, 501 U.S. at 996, 111 S.Ct. at 2702; *see also Harris v. Wright*, 93 F.3d 581, 585 (9th Cir.1996) ("if we put mandatory life imprisonment without parole into a unique constitutional category, we'll be hard pressed to distinguish life with parole; the latter is nearly indistinguishable from a very long, mandatory term of years; and that, in turn, is hard to distinguish from shorter terms"). Thus, "while capital punishment is unique and must be treated specially,

mandatory life imprisonment without parole is ... only an outlying point on the continuum of prison sentences," and there is no basis for applying a narrowing requirement to the an LWOP sentence. *Harris*, 93 F.3d at 585.

Finally, the petitioner argues that imposition of the LWOP sentence deprived him of his constitutional rights to due process and equal protection. However, the petitioner fails to explain how he was denied due process or equal protection of the law; rather, these claims are essentially duplicative of his Eighth Amendment contention. Therefore, this Court finds that there is no merit to petitioner's argument that death penalty jurisprudence should be extended to his LWOP sentence, and that his rights under the Eighth Amendment's cruel and unusual punishment provision and the Fourteenth Amendment's due process equal protection provisions were violated.

### RECOMMENDATION

IT IS RECOMMENDED that the Court issue an Order: (1) approving and adopting this Report and Recommendation; (2) adopting the Report and Recommendation as the findings of fact and conclusions of law herein; and (3) directing that Judgment be entered denying the petition and dismissing the action with prejudice.

DATED: Feb. 25, 1997.

